# Catani, Appellant, v. Swift & Company.

*Negligence—Sales—Diseased meat—Packer's liability to consumer—Act of Congress of June 30, 1906, c. 3915, 34 U. S. Stat. 768—Case for jury.*

1. Where meat is sold by a packer to a retail dealer there is an implied warranty that it is free from disease, wholesome and fit to eat, and where the dealer sells the meat in the original packages such warranty extends to the consumer, who may recover directly from the packer for injury resulting from the diseased condition of the food.

2. It is no defense to such suit that the meat was inspected and approved by the United States government officials under the provision of the Act of Congress of June 30, 1906, c. 3915, 34 U. S. Stat. 768. The packer's duty to inspect, imposed by the common law, is absolute.

3. In an action for the death of plaintiff's husband resulting from trichinosis, which he contracted from eating diseased pork sold by defendant packer to a dealer and by the dealer sold to plaintiff in the original package, the case was for the jury and the entry of judgment for defendant n. o. v. was error.

Mr. Chief Justice BROWN dissents.

Argued April 14, 1915. Appeal, No. 339, Jan. T., 1914, by plaintiff, from judgment of C. P. Luzerne Co., Feb. T., 1911, No. 545, for defendant n. o. v., in case of Agnes Catani v. Swift & Company. Before BROWN, C. J., MESTREZAT, POTTER, STEWART and FRAZER, JJ. Reversed.

Trespass to recover damages for the death of plaintiff's husband. Before WOODWARD, J.

The opinion of the Supreme Court states the facts.

Verdict for plaintiff for $3,000. The court subsequently entered judgment for defendant n. o. v. Plaintiff appealed.

*Error assigned,* among others, was in entering judgment for defendant n. o. v.

*Rush Trescott,* with him *Joseph P. Lord,* for appellant.—There was an implied warranty by Swift & Company that the meat sold and delivered was free from disease, wholesome and fit for human food: Craft v. Parker, Webb & Co., 96 Mich. 245, (55 N. W. Repr. 812); Bishop v. Weber, 139 Mass. 411, (1 N. E. Repr. 154); Farrell v. Manhattan Market Co., 198 Mass. 271, (84 N. E. Repr. 481).

It was not material that the meat sold may have passed through the hands of middlemen: Elkins, Bly & Co. v. McKean, 79 Pa. 493.

*Frank L. Horton,* with him *R. C. McManus, Richard B. Sheridan* and *Chas. B. Lenahan,* for appellee.—The defendant was not shown to have been guilty of negligence in packing the meat or that the diseased meat was the cause of the death of plaintiff's husband: Savitz v. Lehigh & New England R. R. Co., 199 Pa. 218; Price v. Lehigh Valley R. R. Co., 202 Pa. 176; McClain v. Henderson, 187 Pa. 283; Ott v. Boggs, 219 Pa. 614; Green v. Pittsburgh, McKeesport & Greensburg St. Ry. Co., 219 Pa. 241.

The inspection of the meat by the United States Government officials relieved defendant of the duty to make such inspection.

OPINION BY MR. JUSTICE FRAZER, October 4, 1915:

This was an action of trespass by plaintiff to recover damages for the death of her husband which resulted from eating unwholesome and diseased pork slaughtered by defendant in the State of Missouri and shipped to its distributing house at the Borough of Nanticoke in this State and there sold to a dealer and delivered to plaintiff in its original package, which bore the government stamp showing an inspection by United States inspectors. Plaintiff produced evidence that her husband and other members of the family had eaten the pork and all subsequently became ill, her husband dying a short time later from what the evidence tended to show was trichinosis, a disease resulting from eating meat containing trichinæ, a small parasite or germ which multiplies rapidly and bores through the walls of the intestines, stomach and muscles of the human body and poisons the system. The trial judge submitted to the jury the questions whether plaintiff's husband died of trichinosis, and if so, if he contracted the disease from pork sold by defendant and eaten by him. The jury returned a verdict for plaintiff, thus deciding both questions in the affirmative. Judgment non obstante veredicto was however subsequently entered for defendant on the

ground that the Federal laws having been complied with and the meat inspected by the United States inspectors, and certified to be sound, defendant was not liable, in the absence of negligence in the transportation or handling of the meat subsequent to the inspection, even though it made no further inspection. From the judgment entered plaintiff appeals assigning as error this action of the court.

The sale in this case was not made by defendant to plaintiff directly but indirectly through Louis Otocavani a dealer though the testimony as to this is not clear. But assuming Otocavani who ordered the meat was a dealer, the first question to be considered is whether there was an implied warranty by defendant, that the meat sold to the dealer was free from disease, wholesome and fit to eat and whether this warranty extended to the consumer after the meat had passed through the dealer's hands.

The general rule is that where the sale of articles of food is for immediate consumption there is an implied warranty that the food is wholesome and fit for the purpose intended, irrespective of the seller's knowledge of disease or defects therein: 35 Cyc. 407 and cases cited. The Supreme Court of Illinois after an exhaustive review of the subject in Wiedeman v. Keller, 171 Ill. 93, said at page 98, "As a general rule, we think the decided weight of authority in the United States is, that in all sales of meats or provisions for immediate domestic use by a retail dealer there is an implied warranty of fitness and wholesomeness for consumption. There is, however, no implied warranty of soundness or wholesomeness arising from the sale of meats or provisions to a dealer or middleman who buys on the market, not for consumption, but for sale to others. Nor would there be any liability, in a sale for immediate domestic use, where the vendor was not a regular dealer: (10 Am. & Eng. Ency. of Law, p. 157). In this case, however, the appellee was a regular retail dealer, and as such he sold

the meat to appellant for domestic use, and, under the law as it seems to be settled in this country, as the meat turned out to be unwholesome, he was liable, although he was not aware that it was diseased when he sold it to appellant."

This rule has been put in statutory form in Pennsylvania, as far as it applies to articles of food, by the Act of May 4, 1889, P. L. 87, 3 P. & L. Dig. (2d Ed.), page 6728, which provides that "In every sale of green, salted, pickled or smoked meats, lard and other articles of merchandise, used wholly or in part for food, said goods or merchandise shall correspond in kind and quality with the description given, either orally or in writing, by the vender; and in every sale of such goods or merchandise, unless the parties shall agree otherwise, there shall be an implied contract or undertaking that the goods or merchandise are sound and fit for household consumption."

The contention that the warranty did not extend to subsequent purchasers after the meat passed through the hands of middlemen cannot be sustained. The case of Ketterer v. Armour & Company, 200 Fed. Repr. 322, is directly in point, that being a case of sale of pork infected with trichinæ. It was there said by Circuit Judge Noyes, at page 322, "The contention of the defendant is that a manufacturer who deals with the middleman and not directly with the consumer owes the latter no duty whatever except the duty owing to all men to refrain from knowingly and wilfully inflicting injury. And as wilful injury is hardly conceivable the claim comes down to this, that a producer of meats can take no steps to detect poisonous parasites in his products although the danger of their presence is well known and can be guarded against, and yet may sell such products with impunity so far as the demands of poisoned consumers are concerned. This contention is based upon the theory that so long as the manufacturer sells only to the dealer or middleman he is a stranger to the con-

sumer; there is no contractual relationship to base a duty upon.   It is said that the dealer may sue the manufacturer and the consumer may sue the dealer, but that the consumer cannot sue the manufacturer.   In other words if the claim be well founded the middleman has an effective remedy, but he is not injured.   The consumer is injured, but he cannot look to the wrongdoer and must sue the local dealer, who is likely to be irresponsible and is certainly free from fault.

"And this contention has support in authority.   It is unquestionably the rule in the case of many manufactured articles where the consequences of negligent manufacture cannot be followed down to their final results.   Thus, as is pointed out in one of the cases, a careless manufacturer of iron could not be held responsible for the destruction of a steamer from the bursting of a boiler into the construction of which his imperfect material, after passing through many hands, had gone. In such cases, and in others less clear, it is said that public policy requires that the remedy for negligence should not be pressed to an impracticable extreme.   But I am wholly unable to apply this rule in the present case; much more to apply it in the name of public policy.   Public policy regards the public good and I am yet to be convinced that the public welfare will be promoted by holding that producers and manufacturers owe no duty to consumers to guard against diseased and poisonous meats and provisions except in those isolated cases where they happen to sell directly to them.

"The remedies of injured consumers ought not to be made to depend upon the intricacies of the law of sales. The obligation of the manufacturer should not be based alone upon privity of contract.   It should rest, as was once said, upon 'the demands of social justice.'   The producer should be held responsible for the results of negligent acts which he can readily foresee.   There is no analogy between the case where defective material, after passing through many hands, produces not-to-be-

looked-for ill effects.   The iron manufacturer who fails to inspect a piece of iron cannot foresee that it will be used in a boiler and cause a ship to sink.   But the meat packer who fails to inspect his products for poisonous parasites or ingredients, knows that poison will poison and that the persons to be poisoned through his neglect will be those who eat his products, and no one else. The natural, probable and almost inevitable result of his negligence will be injury to the consumer and, in my opinion, every consideration of law and public policy requires that the consumer should have a remedy."

To the same effect is Meshbesher v. Channellene Oil Co., 107 Minn. 104, where the manufacturer was held liable to the consumer for impure oil purchased by the latter from a retail grocer.

The same rule was applied by this court in Elkins, Bly & Co. v. McKean, 79 Pa. 493, to the sale of oil.   In that case it was said by Mr. Chief Justice AGNEW, page 502, "The substance of that point is, that after the oil had passed from the defendants in large quantities to Arbuckle & Company, and from them in smaller quantities to Caskey, and from Caskey to Steel & Hart, who sold the lampful to McKean, there can be no recovery.   The argument in support of this point is founded upon the alleged successive intervening liabilities of the persons through whose hands the oil had passed.   But this proposition is unsound as a legal defense.   The number of hands through which the oil had passed might furnish a strong argument on the question of identity, and the guilty knowledge of Elkins, Bly & Company as to this particular oil, but could not constitute a legal bar to recovery, if the identity of the oil and the guilty knowledge were made clear.   Certainly one who knowingly makes and puts on the market for domestic and other use, such a death dealing fluid, can not claim exemption from liability for his terrible wrong, because he has sent it through many hands.   The length of its passage may create a doubt of its identity, or that

it was sent on its mission of destruction with a full purpose and knowledge of its dangerous qualities, but the facts being established, he cannot escape the consequences of his crime against society.   The maxim qui facit per alium facit per se, applies as clearly as the other maxim, sic utere tuo ut alienum non laedas. When the article is thrown into the current of trade on the faith of the affirmation of its manufacturers that it is a fit oil for light, and can be safely used in the family, or where it may be required for illumination, they cannot follow it, or avert its injuries, or determine how much of the responsibility is due to others."

These authorities effectually dispose of this question. It is contended by defendant, however, that since the sale was made in the original package, used in interstate shipment, the transaction was exclusively within the federal statutes relating to the inspection and sale and transportation of meat and neither the common law doctrine of implied warranty nor the Pennsylvania statute above referred to, nor other Pennsylvania statute law forbidding the sale of adulterated food applies, and as defendant had fully complied with the Federal Inspection Laws, the lower court was right in entering judgment for defendant non obstante veredicto.

Section 2 of the Federal Act of June 30, 1906, c. 3915, 34 U. S. Stat. 768; 4, Compiled Statutes, page 3958, prohibits interstate shipment of adulterated food or drugs and makes a violation of the act a misdemeanor and provides penalties therefor.   Section 7 of this act, defines adulteration in the case of meats as consisting "in whole or in part of a filthy, decomposed or putrid animal or vegetable substance, or any portion of an animal unfit for food, whether manufactured or not, or if it is the product of a diseased animal, or one that has died otherwise than by slaughter."

The Federal Act of March 4; 1907, c. 2907, 34 U. S. Stat. 1256, U. S. Compiled Statutes of 1913, vol. 4, page 3936, sec. 21, provides that any person who shall "sell or

offer for sale or transportation for interstate or foreign commerce, any meat or meat food products which are diseased, unsound, unhealthful, unwholesome, or otherwise unfit for human food, knowing that such meat food products are intended for human consumption, he shall be guilty of a misdemeanor." The same act, sec. 19, Comp. Stat., page 3935, authorizes the secretary of agriculture to appoint inspectors at all slaughter-houses, packing-houses, etc., to examine animals in accordance with the rules and regulations to be prescribed by him. Under these rules the packer is forbidden to make an inspection prior to the government's inspection, in the manner in which such inspection is made, but there is nothing to indicate that a subsequent independent inspection is forbidden or could not be made by the packer. Defendant made no pretense of showing such independent inspection or examination but relies upon the argument, that no such inspection was necessary and that its duty to the consumer was fulfilled by the government inspection in analogy to the decisions under the Pennsylvania Coal Mining Laws requiring the placing of underground mining works under supervision and control of a certified mine foreman, for whose negligence the mine owner is held not responsible: Durkin v. Kingston Coal Co., 171 Pa. 193. It should be noted however, that the federal statutes do not require the packer to surrender control of his establishment as is the case with the Pennsylvania mine owner. All that the former is required to do is to afford an opportunity for the government officials to make an inspection. The question was decided contrary to defendant's contention in O'Connor v. Armour Packing Co., 158 Fed. Repr. 241. While that was a case involving the duty of a master to a servant, the duty of defendant to the public, would seem to be as high as his duty to his servant. In that case it was said at page 248, "the contention of the defendant is that the inspection by the government was all that could be required, and that, under the circumstances, the master

was not chargeable with the duty of making any inspection. It was not denied that the doctrine requiring inspection was applicable to the case, but the contention is that the inspection provided was sufficient, as matter of law, to relieve the defendant of the charge of negligence."

The object of federal statutes requiring inspection was to provide additional safeguards against the traffic in spoiled or diseased cattle and meats. They should not be so construed or applied as to deprive any one injured or damaged by the negligence or wrong doing of a dealer in or a vendor of cattle, or meats, any remedy which he had under laws existing when the statutes were enacted. We are not of opinion that the inspection by government officials of a place, machinery, instrumentality, or material necessarily and as matter of law releases the master from his duty to make such examinations and inspections as are required of him by the rule which demands that he exercise ordinary and reasonable care for the safety of his servants."

The question was also discussed in Clintsman v. Northrop, 8 Cowen 45, where it was said as to the effect of an official inspection and stamp of goods, at page 46: "The act does not declare that the certificate or mark of the inspector shall be conclusive. It is not the object or policy of our system of inspection laws, to render the decisions of the different inspectors of flour, beef, pork, staves, leather, &c., final and conclusive. The object of those laws is to protect the community, so far as they apply to domestic sales, from frauds and impositions; and, in relation to articles designed for exportation, to preserve the character and reputation of the state in foreign markets.

"I am not aware that the law, in any case, gives a conclusive effect to the ex parte certificate of a public officer, in relation to matters which depend upon the exercise of integrity, judgment and discretion; and by which private rights and contracts may be seriously affected."

We agree with the reasoning of above cases and hold

that the federal statutes providing for meat inspection by government officers, do not relieve the packer from liability for damages where he has made no inspection nor taken any steps to ascertain for himself whether the meat sold by him is fit for food. The common law duty to sell only wholesome food still remains and the burden of discharging this duty has not been shifted to government inspectors. The jury having found that the death of plaintiff's husband was the result of eating meat packed by defendant which was affected by a disease which the evidence showed was discoverable by proper inspection, the burden was on defendant to show fulfillment of its duty, which burden was not met by merely proving inspection by the United States government inspectors.

Under the foregoing principles, governing the sale of articles of food, a prima facie case is made out by proof that the meat sold by defendant was diseased and caused the death of plaintiff's husband. It was not necessary to go farther and prove defendant knew the food was unwholesome. Defendant's duty was absolute: 35 Cyc. 407; Wiedeman v. Keller, supra; Meshbesher v. Channellene Oil Co., supra. It was bound to know that the meat was unwholesome and unfit for food and this duty was not performed by merely showing an inspection and approval by United States government inspectors. This view of the case makes it unnecessary to discuss the question raised as to the admissibility of the depositions. The judgment is reversed and judgment is directed to be entered in favor of plaintiff on the verdict.

Mr. Chief Justice Brown dissents.