## KETTERER v. ARMOUR & CO.

(Circuit Court of Appeals, Second Circuit. December 11, 1917.)

### No. 11.

1. TORTS ☞8—INVASION OF PERSONAL RIGHTS—LIABILITY—"PERSONAL SECURITY."

One of the absolute rights which every person possesses is that of personal security, which consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation, and every wrongful invasion of such right of personal security gives rise to a liability in tort for the damage done.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Personal Security.]

2. FOOD ☞25—SALES—WARRANTIES.

While at common law, if there is no express warranty of the quality of the goods sold and no fraud, the maxim of caveat emptor applies, and no warranty is implied by law, the rule is otherwise with respect to an article sold directly for consumption, as food, and the seller is liable for the consequences where he knew, or by the exercise of reasonable care might have known, that it was dangerous.

3. FOOD ☞25—SALES—LIABILITY.

While ordinarily a manufacturer or vendor is not liable to third parties who have no contractual relations with him, the rule is otherwise with respect to one dealing with imminently dangerous articles as unwholesome food; and, where a manufacturer of food from diseased pork disposed of it to a dealer, and the dealer in turn sold it to one in whose family plaintiff was employed as a domestic, plaintiff may, having suffered injury from eating the unwholesome food recover against the manufacturer, as though there were no contractual relations between them.

4. FOOD ☞25—MANUFACTURER—DEFENSE.

Where a packer engaged in interstate commerce negligently manufactured food from diseased pork, the fact that it had been inspected and passed by United States inspectors provided for by Comp. St. 1916, §§ 8681–8716, does not relieve the packer from liability; the purpose of the inspection being to impose additional safeguards, instead of freeing packers from liability for negligence.

5. NEGLIGENCE ☞30—CARE—ORDINARY CARE.

Where it appears that everybody engaged in a particular business conducts it in a certain way, such standard of conduct will be accepted as the standard of ordinary care of prudent men engaged in that particular business.

6. NEGLIGENCE ☞56(1)—LIABILITY—PROXIMATE CAUSE.

There is no liability for a negligent act unless the negligent act is the proximate cause of the injury, and to establish proximate cause, it is necessary that there be a causal connection between the negligent act and the injury.

7. FOOD ☞25—ACTIONS—EVIDENCE—SUFFICIENCY.

In an action by plaintiff who contracted trichinosis after eating a product manufactured by defendant from diseased pork, evidence held insufficient to show that defendant was negligent in its inspection and sale of the product, or that its negligence, if any, was the proximate cause of

the injury; it appearing that the pork was marked, "Inspected and Passed" by the United States Inspectors, who were conversant with the mode of inspection.

8. FOOD ☞25—ACTIONS—EVIDENCE—SUFFICIENCY.

In action for injuries received by plaintiff, who ate food manufactured by defendant from pork which was infected with trichinæ, evidence *held* insufficient to show that defendant in its preparation of the product was guilty of negligence; it appearing that if it had submitted the pork to a temperature sufficient to kill the parasites, it would have destroyed its food value.

In Error to the District Court of the United States for the Southern District of New York.

Action by Sophie Ketterer against Armour & Co. There was a judgment for defendant, the complaint being dismissed, and plaintiff brings error. Affirmed.

See, also, 200 Fed. 322.

The plaintiff is a subject of the Emperor of Germany and a resident and inhabitant of the state of New York in the Southern district thereof.

The defendant is a corporation organized and existing under the laws of the state of Illinois, and is engaged in the interstate commerce of meat and food products.

It is alleged that defendant caused to be transported from a state other than the state of New York to the city and state of New York cerain food products consisting of prepared pork or lachshinkens which had not been inspected, and had not been thoroughly cured, and which had been falsely marked as "Inspected and Passed"; that the plaintiff procured from a dealer in the city of New York some of the said pork or lachshinkens not knowing that it was unwholesome, diseased, and infected with parasites known as trichinæ, and that it was dangerous to the life, health, and safety of the consumers thereof as an article of food; that the plaintiff ate of the lachshinkens, as a result of which she became seriously sick, suffered great pain and agony; that the plaintiff's health in consequence was permanently impaired; that for a long time after her illness she was unable to perform any work whatsoever, and was compelled to expend various sums for medicine and medical treatment; and that her injuries resulted from the defendant's negligence as aforesaid. Damages were asked in the sum of $6,000.

The defendant demurred to the complaint on the theory that a manufacturer who deals with a middleman and not directly with the consumer owes the latter no duty whatever except the duty owing to all men to refrain from knowingly and willfully inflicting injury. The demurrer was overruled by Judge Noyes sitting at the time in the Circuit Court, and defendant was allowed to answer over. (D. C.) 200 Fed. 322. An answer was then put in which denied the allegations of the complaint. The case went to trial, and at the end thereof the defendant moved for a nonsuit and the direction of verdict, and both motions were denied. The jury, after being out some time, reported it could not agree, but was sent back to continue its deliberations, and after a time returned a verdict in favor of the plaintiff for six cents. A motion was then made on behalf of defendant to set aside the verdict as being contrary to the law and the evidence, and to dismiss the complaint on the ground that the evidence failed to establish a cause of action. This motion was granted, and the plaintiff brought the case on writ of error to this court.

Chas. Dushkind, of New York City, for plaintiff in error.

Breed, Abbott & Morgan, of New York City, and A. R. Urion, W. C. Kirk, and A. F. Reichman, all of Chicago, Ill., for defendant in error.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ROGERS, Circuit Judge (after stating the facts as above). This is not an action upon a contract either express or implied. The basis of the complaint is the negligence of the defendant, and the action is in tort. It is alleged that the defendant negligently failed to perform its duty to make or cause to be made certain inspections for the discovery or detection of certain infection, disease, or parasites in the carcasses of hogs so that such carcasses might be eliminated from those sold for human consumption as food, or from those used in the prepared food products sold for human consumption. It is also alleged that it failed to have a certain food product, the lachshinkens, which it prepared, sold, and caused to be transported in interstate commerce, thoroughly cured, and thereby imperiled and endangered the life and health of the plaintiff, a consumer thereof.

A lachshinken is made up of two or more loins of pork put up in a casing in the form of a heavy bologna, and is cured and smoked and sold to the trade as a prepared food ready for consumption. It was not sold to the plaintiff, but to one Heimerdinger in whose family she was employed as a domestic. Heimerdinger purchased the product from a dealer who purchased it from defendant. The members of Heimerdinger's family, including the plaintiff, partook of it, and all who partook of it became seriously ill. The disease was diagnosed by the physicians as trichinosis, the nature of the disease being determined, not merely upon objective symptoms, but upon a scientific blood test, which proved unmistakably the character of the disease. Trichinosis is a disease that can be contracted only by eating pork or ham from hogs infected with a certain parasite known as trichinæ. The claim is that the lachshinkens which the plaintiff ate were infected with trichinæ, and that the defendant is responsible, as it put them on the market and sold them without making the necessary examination to determine whether the pork was infected with trichinæ.

[1] One of the absolute rights which every person possesses and is entitled to enjoy, whether out of society or in it, is that of personal security, which consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, his reputation; and more specifically as to the right to health Blackstone defines it as the right to "the preservation of a man's health from such practices as may prejudice or annoy it." 1 Blackstone, p. 134. It is elementary that every wrongful violation of a right of personal security which causes damage gives rise to a liability to make compensation for the damage done, and is a tort. In the present case the action is not based on any contract for no privity of contract exists between plaintiff and defendant. The plaintiff bought nothing from defendant, and bought nothing from the dealer to whom defendant sold the product which he had prepared. But that fact does not necessarily preclude a right of recovery under the circumstances of this case.

Blackstone in his Commentaries, vol. 3, p. 165, says that in contracts for provisions it is always implied that they are wholesome, and that if they be not, an action on the case lies for deceit. In referring to this it is said in American & English Encyclopedia of Law, vol. 15, p. 1237, that:

"No authority is cited for this proposition, and it is believed that the English cases support the rule that at common law there is no implied warranty of quality, fitness, or wholesomeness in the sale of provisions, even when sold by a dealer for immediate domestic use, except in cases where such warranty would be implied from the facts and circumstances of the sale, independently of the fact that the thing sold was an article for domestic consumption."

In 35 Cyc. 406, the statement is that:

"There is no implied warranty of the quality of provisions when they are sold merely as merchandise, as for instance when the articles are sold to a middleman, or are sold to a dealer for the purpose of resale, especially where the seller himself is not a regular dealer, it being held that in such transactions the rule of caveat emptor applies. The rule prevails even when the seller knows that the buyer intends to resell to the consumer. But there is at least a warranty that the articles shall be merchantable. It is, however, the general rule that where the sale is for immediate consumption there is an implied warranty that the food is wholesome and fit for the purpose, irrespective of the seller's knowledge of defects therein."

[2] The general rule of the common law is undoubtedly that upon a sale of goods, if there be no express warranty of the quality of the goods sold and no fraud, the maxim caveat emptor applies, and no warranty is implied by law. Howard v. Emerson, 110 Mass. 320, 14 Am. Rep. 608. It was contended in that case that when articles of food are sold for immediate domestic use, the general rule does not apply, and that there is an implied warranty or representation that they are sound and fit for food. The court said:

"But we think that this exception, if established, does not extend beyond the case of a dealer who sells provisions directly to the consumer for domestic use. In such cases it may be reasonable to infer a tacit understanding, which enters into the contract, that the provisions are sound. The relation of the buyer to the seller and the circumstances of the sale may raise the presumption that the seller impliedly represents them to be sound. But the same reasons are not applicable to the case of one dealer selling to another dealer; and we think the rule is settled that in the sale of provisions, in the course of general commercial transactions, the maxim caveat emptor applies, and there is no implied warranty or representation of quality or fitness. Emerson v. Brigham, 10 Mass. 197 [6 Am. Dec. 109]; Winsor v. Lombard, 18 Pick. [Mass.] 57; Hart v. Wright, 17 Wend. [N. Y.] 267; Wright v. Hart, 18 Wend. [N. Y.] 449; Moses v. Mead, 1 Denio [N. Y.] 378, [43 Am. Dec. 676]; Burnby v. Bollett, 16 M. & W. 644."

In Craft v. Parker, 96 Mich. 245, 55 N. W. 812, 21 L. R. A. 139 (1893), the court held that a keeper of a meat market is bound to use due care to see that the meats sold are fit for human consumption, and he impliedly warrants that they are fit for the purpose for which they are sold, and if he sells food that is dangerous to those who eat it he is liable for the consequences if he knew it to be dangerous or by proper care could have known of its condition.

In Wiedeman v. Keller, 171 Ill. 93, 98, 49 N. E. 210, 211 (1897) the court said:

"As a general rule, we think the decided weight of authority in the United States is that in all sales of meats or provisions for immediate domestic use by a retail dealer there is an implied warranty of fitness and wholesomeness for consumption. There is, however, no implied warranty of soundness or wholesomeness arising from the sale of meats or provisions to a dealer or middleman who buys on the market, not for consumption, but for sale to others. Nor would there be any liability, in a sale for immediate domestic use,

where the vendor was not a regular dealer. * * * In this case, however, the appellee was a regular retail dealer, and as such he sold the meat to appellant for domestic use, and, under the law as it seems to be settled in this country, as the meat turned out to be unwholesome, he was liable, although he was not aware that it was diseased when he sold it to appellant."

In Salmon v. Libby, 219 Ill. 421, 76 N. E. 573 (1905) a declaration was held good which alleged that the defendant prepared and put up in a package and sold to the trade certain mincemeat, which passed through the hands of a wholesale dealer, a retail dealer, and came finally to be made into a pie of which the plaintiff's testator ate; that defendant negligently and improperly prepared and manufactured the mincemeat; that as a result it became unfit for food and poisonous and destructive of life when used as food, and plaintiff's testator lawfully partook of the same, was poisoned, and lost his life in consequence.

In Park v. C. C. Yost Pie Co., 93 Kan. 334, 144 Pac. 202, L. R. A. 1915C, 179 (1914), the court held that a manufacturer who prepares food for human consumption and places it in the hands of a dealer for sale is responsible in damages to the widow of a consumer who procures such food from the dealer and loses his life by partaking of such food. The court said that a manufacturer or dealer who puts human food upon the market for sale or for immediate consumption does so upon an implied representation that it is wholesome for human consumption. Practically, he must know it is fit or take the consequences if it proves destructive. In that case the deceased came to his death from ptomaine poisoning resulting from eating a pie manufactured by defendant, who sold it to a retail grocer who in turn sold it to the deceased.

We do not find it necessary in this case to determine, and we therefore do not decide, what, if any, difference exists in the liability of the manufacturer of food products who sells to a dealer and of a dealer who sells to a customer. We may assume, for the purpose of this case, that the defendant in selling lachshinken as a food product ready for consumption would be responsible if he knew it was unwholesome or if by proper care he could have known of its condition.

This brings us to consider whether the defendant's liability would extend to one who did not buy it either from the defendant or from a dealer to whom the defendant had sold it, but who had nevertheless eaten of it and been infected by it.

[3] The general rule is that a manufacturer or vendor is not liable to third parties who have no contractual relations with him. See Winterbottom v. Wright, 10 M. & W. 109, which is the leading case on the subject and has since been followed by the courts in England and the United States in numerous decisions. But as is pointed out by Judge Cooley in his work on Torts (3d Ed.) vol. 2, p. 1489, there are exceptions to the rule which are as well defined and settled as the rule itself. One of these exceptions is that a person who deals with an imminently dangerous article owes a public duty to all to whom it may come to exercise care in proportion to the peril involved. And he enumerates, in illustration of such articles, poisonous drugs, patent

medicines containing ingredients likely to produce injury, and unwholesome food.

And in Huset v. J. I. Case Threshing Machine Co., 57 C. C. A. 237, 242, 120 Fed. 865, 870 (1903) Judge Sanborn, after stating the general rule as above pointed out, declares that there are three exceptions to it. "The first is," he says, "that an act of negligence of a manufacturer or vendor which is imminently dangerous to the life or health of mankind, and which is committed in the preparation or sale of an article intended to preserve, destroy, or affect human lfe, is actionable by third parties who suffer from the negligence."

The leading American case is Thomas v. Winchester, 6 N. Y. 397, 57 Am. Dec. 455 (1852). That case related, however, to a sale of a drug, and it was held that when a dealer in drugs and medicines carelessly labels a deadly poison as a harmless medicine and sends it so labeled into market, he is liable to all persons who, without fault on their part, are injured by using it as such medicine in consequence of the false label; that such liability arises not out of contract or privity between the dealer and the person injured, but out of the duty which the law imposes upon the former to avoid acts in their nature dangerous to the lives of others. And in Blood Balm Co. v. Cooper, 83 Ga. 457, 10 S. E. 118, 5 L. R. A. 612, 20 Am. St. Rep. 324 (1889), a proprietor of a patent medicine who sold to a druggist for resale to any who wished it was held liable to one who bought it of the druggist and used it according to the prescription on the bottle. The court said it could see no difference whether the medicine was directly sold to the plaintiff by the proprietor or by an intermediate party to whom the proprietor had sold it in the first instance for the purpose of being sold again.

In such cases as the above, whether the sale is of poisonous drugs or unwholesome food, the liability reaches to any person whom it might be reasonably foreseen would be injuriously affected by it. Malone v. Jones, 91 Kan. 815, 818, 139 Pac. 387, L. R. A. 1915A, 328 (1914); s. c., 92 Kan. 708, 142 Pac. 274, L. R. A. 1915A, 331 (1914). In Bishop v. Weber, 139 Mass. 411, 1 N. E. 154, 52 Am. Rep. 715, a caterer who furnished unwholesome food partaken by a guest was held liable for the injurious consequences. It was said in that case that the furnishing of provisions which endanger human life or health stands clearly upon the same ground as the administering of improper medicines, from which a liability springs irrespective of any question of privity of contract between the parties.

In Weiser v. Holzman, 33 Wash. 87, 73 Pac. 797, 99 Am. Rep. 932 (1903) the court declared that one who sells and delivers to another an article intrinsically dangerous to human life or health, such as a poison, an explosive, or the like, knowing it to be such, without notice to the purchaser that it is intrinsically dangerous, is responsible to any person who is, without fault on his part, injured thereby. The rule, it is said, does not rest on any principle that the original act of delivering the article is wrongful, and that every one is responsible for the natural consequences of his wrongful act.

In Skinn v. Reutter, 135 Mich. 57, 97 N. W. 152, 63 L. R. A. 743, 106 Am. St. Rep. 384 (1903), the court held that a person who sold hogs to

a dealer knowing them to be afflicted with a dangerous and infectious disease was liable to a third person, who purchased them of the dealer and placed them with other hogs, for the value not only of the hogs purchased, but also of those which died from the contagion, where neither the original nor subsequent purchaser knew or had notice of their diseased condition.

In Bergen v. Standard Oil Co., 126 Ky. 155, 159, 103 S. W. 245, 11 L. R. A. (N. S.) 238 (1909) the court said that when a manufacturer or furnisher of an article is negligent in its composition, construction, or sale, so that injury results, not to the vendee, but to a stranger, the general rule is that the seller is not liable unless either the article is an imminently dangerous one, or the seller has knowledge of its defects, and that they are such as to endanger life or property without notice or warning of the defects.

In Tomlinson v. Armour & Co., 75 N. J. Law, 748, 70 Atl. 314, 19 L. R. A. (N. S.) 923 (1908), a case in the Court of Errors and Appeals, Chancellor Pitney writing for the court said:

> "Upon both reason and authority we are clearly of the opinion that the declaration before us sets up a good cause of action. The fact that the defendant was the manufacturer, presumably having knowledge or opportunity for knowledge of the contents of the cans and of the process of manufacture; that it put the goods upon the market for sale by dealers to consumers under circumstances such that neither dealer nor consumer had opportunity for knowledge of the contents; the fact that the goods were thus manufactured and marketed under circumstances that imported a representation to intending purchasers that they were fit for food and beneficial to the human body; that in the ordinary course of business there was a probability (it being, indeed, the very purpose of the defendant) that the goods should be purchased, and used by parties purchasing, in reliance upon the representation, and that the defendant negligently prepared the food so that it was unwholesome and unfit to be eaten and poisonous to the human body, whereby the plaintiff was injured, make a case that renders the defendant liable for the damages sustained by the plaintiff thereby."

We have no difficulty in holding that if the defendant upon the facts disclosed would be liable to Heimerdinger who purchased the product from a dealer, it would also be liable to this plaintiff who as a domestic employed in Heimerdinger's home partook of it.

[4] This brings us to inquire whether the fact that the United States government has established a system of meat inspection has relieved the defendant from its responsibility in the matter.

Congress has passed acts providing for the inspection of meat and meat food products for use in interstate and foreign commerce, and it has provided for the inspection of cattle and meats at packing houses for the purpose of preventing traffic in diseased and unwholesome meats. See U. S. Compiled Statutes 1916, Ann., vol. 8, §§ 8681–8716. And it is provided in section 8681 that the carcasses and parts thereof of all such animals found to be sound, healthful, wholesome, and fit for human food shall be marked, stamped, tagged, or labeled as "Inspected and Passed." The inspection thus authorized is in charge of the Bureau of Animal Industry of the Department of Agriculture of the United States. And at the time of the trial of the case the chief of the Bureau testified that he had approximately 900 inspectors under his charge, some of whom were assigned to all plants of the defendants

where food was prepared for interstate commerce. And such products after inspection were marked "Inspected and Passed." And the lach-shinkens which Heimerdinger purchased were so marked.

The defendant asserts that the control and supervision which the statute confers on the federal government is to all intents and purposes exclusive of any right, power, or opportunity on the part of the owner of slaughtering and packing establishments to make other or additional inspections. Under the regulations prescribed by the Secretary of Agriculture in accordance with the authority conferred upon him by the statute the packer is forbidden to make an inspection prior to the government's inspection. The inspection begins with the live animal, and continues through the entire process of slaughtering, packing, and processing to the final package in which the meat or meat product is shipped, the package not being released for shipment until the federal inspectors have put the federal stamp "United States Inspected and Passed" thereon. The inspection extends through all departments of the plant, including the curing processes, packing, and shipping. The testimony shows that the defendant's plant is absolutely under the control of the government inspectors, there being at the time of the trial between 40 and 50 inspectors in its plants of whom 20 or 25 were veterinaries and the remainder were meat inspectors. Does the government's certificate "United States Inspected and Passed" relieve the packer from any common-law responsibility?

The Circuit Court of Appeals in the Fifth Circuit in O'Connor v. Armour Packing Co., 158 Fed. 241, 85 C. C. A. 459, 15 L. R. A. (N. S.) 812, 14 Ann. Cas. 66 (1908), declared that the object of the federal statutes requiring inspection of cattle and meats at packing houses was to provide additional safeguards against the traffic in spoiled or diseased cattle and meats. "They should not be so construed or applied," the court said, "as to deprive any one injured or damaged by the negligence or wrongdoing of a dealer in or a vendor of cattle or meats [of] any remedy which he had under laws existing when the statutes were enacted." This case was followed in Catani v. Swift & Co., 251 Pa. 52, 62, 95 Atl. 931, L. R. A. 1917B, 1272 (1915), the court holding that the statutes do not relieve the packer from liability for damages where he has made no inspection nor taken any steps to ascertain for himself whether the meat sold by him is fit for food. "The common-law duty," said the court, "to sell only wholesome food still remains, and the burden of discharging this duty has not been shifted to government inspectors." We share in that opinion and hold that the inspection by government officials of the cattle, meat, and meat products as required by the Acts of Congress does not relieve the packers from any liability for negligence on their part to any one injured thereby.

[5-7] The defendant made no inspection of its food products to ascertain whether any of them were infected with trichinæ. And because it made no such inspection it is alleged that it failed to exercise that degree of care which the law demands of those who prepare and sell such products for food consumption. The testimony shows that between 1 and 2 per cent. of hogs slaughtered are so infected. The testimony also shows that the presence of trichinæ in pork can only be ascertained, if at all, by microscopical tests.

It also appears that the government at the time this food product was prepared and sold did not make inspections for the purpose of discovering the presence of trichinæ in hogs, and that such inspection had not been made since 1905, some six years prior to the sale which occasioned the injuries this suit is brought to redress. The Chief of the Bureau of Animal Industry testified as follows:

"Q. But, as a matter of fact, has the defendant company been permitted by the government inspectors to ship for transportation in interstate commerce the carcasses of hogs, or swine, or any of the meat food products prepared from them, since 1905, without any examination or inspection by the government inspectors looking toward the discovery of the presence of trichinæ? A. That question refers to trichinæ inspection, does it not? Q. Yes, trichinæ. A. Yes; the answer is yes. Q. Do the inspections that are usually made by the government inspectors cover inspections required and necessary in order to discover trichinæ? A. No, sir. Q. Is it necessary to make a special inspection or an inspection different from the usual inspection in order to discover the presence of trichinæ? A. Yes, sir. Q. In what respect does the inspection looking for the discovery of trichinæ differ from the usual inspections made by the government inspectors? A. Ordinarily, the presence of disease can usually be determined by detecting the lesions with the naked eye, by the manipulation of the different parts or organs; for inspection of trichinæ it is necessary to examine with a microscope all sections of the meat, to determine the presence or absence of it."

It also appears that the reason why the government does not examine for trichinæ is that the only method of inspection for trichinæ is by microscopical examination, and that such an examination will not necessarily disclose the presence of trichinæ in the carcass, even though there may be trichinæ therein. It only discloses whether trichinæ is present in the particular sample, and there may be trichinæ in the carcass and none in the sample. The chief of the Bureau testified as follows:

"Q. Well, then, it is a fact, is it not, that a single examination does not necessarily disclose the presence of trichinæ, even though there may be trichinæ present? A. There may be trichinæ in the carcass, but not in that particular sample. Q. Is it not a fact, Doctor, that a considerable number of examinations may be made without disclosing the presence of trichinæ? A. Yes, sir. Q. Is it not true that as many as eight or ten different examinations may be made from different parts of the carcass without disclosing the presence of trichinæ and additional examinations disclose the presence of trichinæ? A. Yes; in lightly infected cases, that might be the case. Q. The trichinæ localizes itself in certain parts of the body, does it not? A. To a great degree. Q. And just what that part is you cannot tell without testing the various parts of the body? A. I was going to say, there are usually muscles or regions where they are most generally found, and from those sections we take the samples for inspection, but, of course, they wander or may wander, into almost any portion of the body, but there are usually seats where we look for them. * * * Q. The examination for trichinæ by the microscopic test is not by any means an infallible test, is it? A. No; it is not."

Another expert, said to be the foremost authority in the United States on the subject of trichinosis, testified that the microscopical test cannot be accepted as a guaranty that the pork so examined is free from trichinæ. The following is an excerpt from his testimony:

"Q. Would you say that in the case of the pork loin just mentioned that microscopical tests of four or five pieces of meat cut from various parts of this loin would offer a reasonably certain method of detecting whether or not

it contained trichinæ? A. I would personally not be willing to certify that that pork loin was free from trichinæ. Q. Would a larger number of samples from this pork loin offer a more reasonable method, or basis, of determining this fact? A. You might examine 100 specimens from that same pork loin, and it is conceivably possible that trichinæ might be present but you would not find them. Q. Will you explain the reason for that? A. Well, though the parasites might be in the pork loin, we might find sections of infection where very few of them would be present, and in some parts none would be evident. We might find a number of trichinæ in the diaphragm, for instance, or in the tongue or in some other muscle, and yet relatively few of the parasites in the loin. The distribution of the trichinæ in the body is not necessarily uniform, and therefore an examination of any one portion cannot be taken as a safe standard for examination of the entire carcass."

The chief of the Bureau of Animal Industry was questioned as to the policy of not inspecting for trichinæ, and his testimony is deserving of attention.

"Q. Do you think, Doctor, that because a certain test is not altogether absolute, you would make no test at all, even though you could minimize the danger? A. That is probably a matter of opinion as to whether more could be accomplished by making it or not. Q. Would you do away with vaccination, if vaccination is not absolute protection? A. No. Q. Well, would you do away with disinfectants, if disinfectants were not absolutely preventive? A. No; the question in my mind has been whether microscopic inspection might induce people to regard it as an absolute protection, and therefore not take other precaution, such as cooking, to completely avoid danger. Q. Would it not be the safer course to minimize the danger and give this additional protection to the people, instead of making no tests at all? A. That has been a question in our minds—as to whether it would not induce more cases of trichinæ by more people partaking of uncooked pork than of cooking it. Q. Do you not think the proper course would be to minimize the danger by making these inspections, and then to take this extra precaution by advising them that the pork should be cooked? A. That, I think, is a very hard question to answer, as practice alone, I presume, could determine whether it would or would not. Q. Would you do away with any preventive or precautionary measure if it was not absolutely safe, even though you could minimize the danger? A. It is probably a safer way to do away with a measure which is supposed to protect and which does not. Personally, I should not eat any raw pork, whether it was microscopically inspected or not; and if we could only convince all the people of the same thing, the whole matter would be solved."

The testimony disclosed that, while in Germany inspection for trichinæ is made, the result has not been very assuring. There were reported in that country between 1881 and 1898, 6,329 cases of trichinosis with 319 deaths. Of these cases and deaths 2,042 cases and 112 deaths were due to meat which had been inspected and passed as free from trichinæ. Counsel would have the court believe that these figures show the practical inefficiency of such examinations, and that approximately as many deaths occurred from the eating of meat which had been microscopically inspected and passed as free from trichinæ as had occurred from the eating of meat which had not been so examined. But the testimony of the expert was that the infection by trichinæ of hogs is greater in the United States than in Germany, and that microscopical inspection carried out by properly trained persons would reduce very greatly the chances of placing trichinous pork on the market, although such an examination could not be accepted as a guaranty that pork so examined is free from trichinæ. He also testified that he

regarded the method pursued by the Bureau of Animal Industry as a reasonably safe and practical method of insuring wholesome meat.

The inspection made by the government of the United States extends only to establishments which ship their products in interstate commerce and not to dealers who sell their goods within the state in which they are prepared. Many of the states have laws of their own governing the inspection of meat food products, and the chief of the Bureau of Animal Industry testified that he did not know of any one of them having microscopic inspections. He also testified that he did not know of a single individual or firm in the country engaged in preparing pork for consumption as a food product that made inspections for trichinæ, although he had heard that there was one establishment which did it and of another which was preparing to do it. He was asked: "Is it not a fact, Doctor, that the general use and practically universal practice is, on the part of those engaged in the business of slaughtering and preparing hogs for sale and consumption for human food, not to examine for trichinæ?" And he answered in the affirmative.

A general custom of the persons or corporations which manufacture meat products to be sold for food to conduct the business in a given way affords the most satisfactory evidence in support of the conclusion that the defendant conducted its business with ordinary care. When it appears that everybody engaged in a particular business conducts it in a certain way, we conclude that the defendant in conducting his business in the way that everybody else in the like business does has measured up to the standard demanded by the law and exercised the ordinary care of prudent men engaged in the business. See Thompson on Negligence, § 31, vol. 1. No one is held by the law to a higher degree of care than the average in the trade or business in which he is engaged.

And as there might have been a number of microscopical inspections made without discovering the trichinæ, which might still have been present and caused the very injury of which complaint is made, the failure to make tests cannot be held to be the direct and proximate cause of the injury complained of, and without which it would not have occurred. There is no liability for a negligent act unless the negligent act is the proximate cause of the injury. And to establish proximate cause it is necessary that there be a causal connection between the negligent act and the injury. The act must have been such that without it the injury would not have happened. 29 Cyc. 489.

[8] But it is said that, even if the defendant was not under obligations to make microscopical inspections for trichinæ the plaintiff is still entitled to maintain this action because of defendant's negligence in curing the meat. This claim is based on the proposition that lachshinken is a prepared meat food product, cured and made ready for consumption in its prepared form, and that a thorough cure kills trichinæ parasites and renders the meat safe and harmless for human food, and that, inasmuch as the lachshinken which defendant sold in the instance complained of contained trichinæ, it must have been improperly cured. The evidence makes it clear, so far as the question of curing the lachshinken is concerned, that a cure sufficient to kill trichinæ would be much too strong, as it would make the meat inedible and destroy it as an article of food. And the undisputed evidence shows that lach-

shinken is made by all manufacturers to all intents and purposes in exactly the same way. The lachshinken which the plaintiff ate was made in the same way that defendant has always made its lachshinken, and if it had been subjected to a temperature of 160 degrees Fahrenheit which would have been necessary to kill trichinæ, it would not have been accepted by the trade. The government of United States knew the character and kind of cure to which the lachshinken was subjected, and yet it stamped it as "Inspected and Passed," and recognized it as a proper and legitimate article of interstate commerce and as a safe and wholesome product for human consumption.

The record discloses no proof of negligence to go to the jury. The court committed no error in setting aside the verdict and in directing judgment to be entered dismissing the complaint.

Judgment affirmed.