ALFRED DAVIS, Appellant, v. VAN CAMP PACKING COMPANY, Appellee.

SALES: Implied Warranty in Sale of Human Food. A manufacturer who prepares and puts upon the market in sealed packages an article of food for human consumption, is held not only to the *highest degree* of care in preparing such article, but is also held to impliedly warrant to the ultimate consumer that the article is fit for human consumption. It follows that the consumer, in purchasing such an article, is not shackled by any rule of *caveat emptor,* and, if injured, without want of care on his part, by eating such article, he may maintain an action for damages against the manufacturer, both (1) for negligence and (2) for breach of implied warranty, even though there is no *privity of contract* between the parties.

FOOD: Proximate Cause of Sickness. Evidence held to present a jury question on the issue whether plaintiff's sickness was caused by eating certain food.

SALES: Express Warranty—Canned Goods. Written statements placed on a can of goods by the manufacturer reviewed, and held not to constitute an express warranty that the food was wholesome and fit for use.

NEGLIGENCE: Evidence—Sufficiency. Evidence held to present
4  a jury question on the issue whether a manufacturer of food
   for human consumption was negligent in its preparation.

FOOD: Negligence in Manufacturing—Prima-Facie Case. One who
5  shows that he was made sick by eating an article of food which.
   was intended for human consumption, makes a prima-facie
   case of negligence on the part of the manufacturer of the
   article, when the processes of manufacturing are unknown to
   the injured party, and are wholly within the knowledge of the
   manufacturer.

EVIDENCE: Similar Facts—Impure Food. On the issue of neg-
6  ligence on the part of a manufacturer in the preparation of an
   article of food, evidence of the impure condition of other pack-
   ages of the same kind of food and the same consignment, is
   admissible.

*Appeal from Webster District Court.*—R. M. Wright, Judge.

FEBRUARY 16, 1920.

REHEARING DENIED OCTOBER 2, 1920.

ACTION at law to recover damages by reason of sickness
on the part of Alfred Davis, alleged to have been caused by
the eating of Van Camp's pork and beans. At the close of
all the evidence, there was a directed verdict for defendant.
Plaintiff appeals.—*Reversed.*

*Price & Hanson,* for appellant.

*Healy & Faville,* for appellee.

PRESTON, J.—The original petition alleges substantially
that, on July 24, 1916, a can of Van Camp's pork and beans
was eaten by certain members of the Davis family, of which

1. SALES:
   implied war-
   ranty in
   sale of
   human
   food.

Alfred Davis, plaintiff, was a member; that,
as a result of eating said beans, plaintiff
sustained damages by reason of ptomaine
poisoning; "that the said defendant was
guilty of negligence, false representations,
and breach of implied and expressed warranty, in placing

in the said can and container said pork and beans, containing poisonous, deleterious, noxious, and unwholesome substances, which rendered the contents of said can unwholesome and dangerous to human life and health."

The petition was assailed by motion, because of a combination of actions, based upon different grounds. There was no ruling on the motion, but appellant amended his petition, and alleged:

"That, as a result of the negligence of the defendant in preparing said food, and in the inspection thereof, and in the packing thereof, the said food contained poisonous and noxious substances, and, as a result of the eating of the said food, said Alfred Davis was poisoned, became sick of said poison, and suffered great bodily, mental pain and anguish."

Appellee admitted its corporate capacity, and that its principal place of business was at Indianapolis, Indiana, and denied other allegations of the petition.

At the close of plaintiff's evidence, defendant moved that plaintiff be required to elect whether he would proceed upon the theory of breach of warranty, express or implied, or upon the grounds of negligence in tort. Plaintiff was required to elect, and at first elected upon breach of implied warranty and tort, but was further required by the court to elect, and he then elected to stand on a tort action.

The main issue in the case is whether. or not there was sufficient evidence to take the case to the jury, and incidentally, whether the case should have been submitted upon breach of warranty and tort, and whether plaintiff should have been permitted to show that other cans of goods, purchased from the same consignment by other consumers, were also defective. Appellee contends that the evidence is not sufficient to show that the eating of the pork and beans caused, or was the proximate cause of, plaintiff's sickness; that, under the law, there is no warranty; and that the evidence shows that there was no negligence.

There is but little dispute in the evidence. Defendant is engaged in the manufacture of pork and beans. Each can bears a label as follows:

"Van Camp's Pork & Beans. .Prepared with tomato sauce. The meat contained herein has been inspected and passed at an establishment where Federal inspection is maintained. The contents of this can are ready for the table and can be served hot or cold.

."To serve hot, place the can in boiling water or empty into frying pan.

"Net contents two pounds, two ounces.

"Prepared by the Van Camp Packing Company, Indianapolis, Indiana."

The can itself bears the word "Sanitary," stamped upon the end. The evidence shows that the word "Sanitary" is stamped by the manufacturer of the can, as their trademark, and applies to the can, rather than to the contents. This was not known to the consumer. The entire label would have a tendency to lull the purchaser into a sense of security. Defendant is engaged in the manufacture of canned goods, including pork and beans, for human consumption. Their goods are dispensed to the consumer principally through jobbers. Defendant, in July, 1916, was jobbing canned pork and beans to the Fort Dodge Grocery Company, for distribution to retailers and consumers. This was known to defendant company. On July 4, 1916, the can of beans in question was received by said grocery company, in a consignment from the defendant company. On July 12th, the grocery company sold to Munn, a retail grocer at Gypsum, five miles east of Fort Dodge, the can of beans in question, with others. On July 24, 1916, this can of beans was sold by Munn to the mother of plaintiff. This was Monday. The can appeared to be all right. The beans were eaten for the evening meal, within an hour after they were brought by Mrs. Davis to the home. When the beans were opened, they were emptied into a bowl. They were not left standing in the can. This evening meal consisted of crackers, bread and butter, potatoes which had been dug that morning from the garden, boiled for dinner and fried for supper, also the can of beans in question, and nothing else. Witnesses describe what they had for the other meals

on that day and the next day. The meals consisted of ordinary food. Some canned peaches were eaten at some of these meals. No canned beans had been eaten for a month before. The family consisted of the father and mother and seven children. Three of the children were not at home for the meal at which the beans were eaten, and did not partake of any of the beans, nor did the father and mother. One of the younger children ate nothing but beans for that meal. This one subsequently died from ptomaine poisoning, and the other three children who ate of the beans were taken sick soon after. Some of them were seriously ill for several weeks. All who ate of the beans were sick after eating. The father and mother and the three other children who did not eat of the beans were not sick. Some time before the date in question, the family had purchased a case of canned peaches. Some of them were eaten at about the time of the eating of the beans, and before and after that date. All the family had partaken, and there were no ill effects. The peaches were not allowed to stand in the can after they were opened. Some of the children had access to the orchard, and had eaten apples. The exact time of this is not shown, but the evidence does show that the apples were about gone at this time. The well was about 60 feet from barn, and near the stock pens. It was hot weather. Plaintiff, 17 years old, had been working in the harvest field, and with others, had drunk the well water from a jug. He had not been ill before eating the beans. There is no evidence that the water was impure. The medical witnesses do not give their opinion that the sickness of plaintiff and the others was caused by any of these other things. They say that ptomaine and metallic poisoning would be caused by contaminated pork and beans, or contaminated peaches. The usual causes of ptomaine poisoning are food contamination. It is food poisoning. It is a poisoning as the result of the introduction into the system of contaminated food. Some of the symptoms from metallic and ptomaine poisoning are the same. In plaintiff's case, the symptoms were more for ptomaine poisoning. The

symptoms of the different ones are given in detail. They varied somewhat in the different individuals. The manner in which they are affected depends somewhat upon the quantity eaten, and other things. The vomit and bowel action of the affected persons, or some of them, showed the presence of beans. A few were whole. The vomiting was beans and a green-colored substance. The medical witnesses give it as their opinion, on the facts shown, that the illness was ptomaine poisoning, from eating the pork and beans in question. Canned goods must be hermetically sealed, to maintain the nontoxic condition. It was shown that the tomato sauce put up in these cans of pork and beans is a combination of tomatoes, vinegar, and spices. The evidence is that the presence of an acid, such as vinegar, or any other acid, attacks the metals of the container, and not the food product. Some vinegar, as fruit vinegar, would have a tendency to increase the rapidity of decomposition of food. Fruit juices are frequently contaminated with ptomaine. Nitrogenous food products are more likely to contain ptomaine than acidulous products. One of defendant's assistant managers, having personal knowledge of the operation of defendant's plants at Indianapolis and Crawfordsville, testifies in detail as to the operation of canning pork and beans; of the purchase, shipment, sorting, etc., of the beans and the pork; also, the raising of tomatoes on their farms in Indiana, the preparation and shipment of the pulp or juice in sealed cans, to the factory; also, the sanitary conditions in the factory, and precautions taken to prevent contamination; that, if the employees are not in good health, they are discharged. The sterilization of the filled cans is at a heat of 240 degrees, for an hour and 50 minutes. The purpose of the sterilization is to kill any micro-organisms that might be in the product, and make them sterile. He states that they realized that the cans go out of the plant as sealed packages; that the consumer has no opportunity of examining them until they are used as food; that there was a government inspector at the plant, to see that these things were done, and that he was there for the pur-

pose of protecting the public; that they had inspection of all the products that go into the can. He testifies to the inspection of the different things before they go into the factory, and of the method of inspection during the process of manufacture and canning. He testifies that, in 1916, the defendant company was behind in its orders; that it had practically no stock on hand; that it was selling pork and beans as fast as it was made, and the company was manufacturing to the limit; that the plant where pork and beans are packed is at Indianapolis. At the factory there, they employ from 750 to 1,000 people. They use about 150,000 bushels of beans per year. They have 6,000 or 7,000 acres of tomatoes that they raise each year. They send out each year approximately 35,000,000 cans of pork and beans. When a car of beans arrives, their sampler takes a composite sample of 10 per cent of the beans in the car. These samples are sent to the laboratory, for analysis and inspection. Other examinations are made, and, after the beans are parboiled, they are turned into a wagon or truck, holding 248 pounds. These wagons or trucks pass by a girl, about five minutes apart. The contents of the trucks are inspected by this girl with a paddle. She stirs them up with a paddle, and inspects them to discover any bean that has a spot. She is looking for spotted beans. He says:

"Once in a while, we are bound to have a little trouble with the co-ordination. If one machine breaks down, we start up another. There are times when our co-ordination of this system doesn't work out perfectly; that is bound to happen anywhere. It is essential that the pork and beans and tomato sauce all arrive at the filling machine to be put in the can at the same time. This is regarded as one of the essentials in the making of the high-grade Van Camp products. The care that is required in making a safe product is the care in sterilization. * * * The making of tomato sauce requires particular care and attention. There is no danger that any of the contents of the can will spoil, where only proper methods are followed. There is more danger of the pork spoiling than the beans."

The chemical department makes no chemical or micro-scopical examination of the finished product.

He recalls one occasion when some of the finished products were taken out of the warehouse and withdrawn from the market. That was because they were off-color. They were afterwards sold to the employees. There was something in the method or system on that occasion that wasn't perfect, or that batch would have come out with the same uniform color as the others. In so far as he knew, they never had the laboratories make a chemical or microscopical test. He describes the washing of the tomatoes, to knock off the dirt, the sorting out of the bad ones, and the cutting out of the bad spots. The preparation of the beans, pork, and tomato sauce is all handled in co-ordination; all timed to come together at the right time. The cans are sealed hot, and the machines seal the lid on, clamp the lid on so it is air-tight. There are two operations in this, called the first roll and the second roll. One roll clamps the lid down, and the second operation folds it under. There is no solder, lead, or zinc used in fastening the lid on the can; nothing but the pressure of the tin, the lid on the can. The cans are then sterilized in a large, iron, round crate; and he gives the number of cans in each crate. After they cool, they are inspected by taking one can from three rings or crates, and opened and inspected for coloring and general appearance. The cans are then put into ricks, labeled, and put in cases. He testifies that the government inspector does not check up the tin cans each day, nor does he check up the laboratory each day; he does not check up every job lot of pork that comes in there each day. Says he doesn't see how any mistakes could happen, in the way they check them up, not if everybody did their duty as he described; but if there is neglect along that line somewhere, there is a possibility of it. He does not attempt to describe the history of any particular can of beans, except as it follows the general method. He testifies that there are times when they are short of help, and they are replaced as soon as they can get more; that, in any system or method of business, there

are always little hitches, from time to time, which cannot be avoided. The cubes of pork are handled with the hands of the employees when they put it in the can. The company and the government recognize that there is a possibility of contamination from the hands of human beings, coming in contact with food products, and that is why the company has a regulation that the employees must always wash their hands before they handle the food. Twenty to twenty-five barrels of pork are used each day. The government inspector looks at the barrels, as they are opened up, and sees if they are covered with brine; then he takes a piece out of the barrel, to see that each piece is the same. During the day, he walks through the plant and stops at the tables to see what they are using. Witness says, "There might be a possibility of a piece of pork getting by him that wasn't right." Another employee of defendant's, an analytical chemist, in charge of the laboratory work at the factory, describes the different tests that are made by his department of the ingredients which enter into the cans of pork and beans. He relates the general system followed by the company, but does not give the history of any particular can of beans, nor does any of the evidence purport to give a history of the particular can of beans in controversy. That, of course, would be difficult for either the defendant or the plaintiff, and less possible for plaintiff, since he had no opportunity to know anything about the process of manufacture. He testifies that the system and method were the usual and ordinary system used throughout the country in canning, and that he knows of no other method more improved, more sanitary, or more modern. The state chemist, medical men, and others testifying as experts, say that the method described by defendant is recognized as being a sanitary and proper method of preparing and canning food products. They say, however, that there are occasions, where the method has the approval of the state department, when the finished product itself is not up to the standard required for food consumption; that, though the general method is the best, most improved, and scientific, when the

method is operated by hundreds of employees, deleterious or unsanitary products might emanate from such a factory; that the success of the method depends upon the care, skill, and efficiency of the employees; that it is always possible that sometimes the method is not applied with the highest skill, and the high standard of the food product is not maintained; that they know of instances where proper methods have been adopted, and yet the products of the plant adopting them have not always been perfect; that they recognize the distinction between the adoption of a method and the practical carrying out of that method by a host of employees in the plant; that the product might be harmful, if the methods were not complied with. They base their opinion that the defendant's method is scientific and proper upon the assumption that the testimony of defendant's manager is a verity. Their evidence is that, after a can of food has been sterilized, it must remain absolutely airproof; that, if the crimping machine didn't do a good job of fastening the lid on, there might be danger of reinoculation, and in that case, decomposition might set in; that, if it did set in, and progressed for any length of time, the food might become deleterious; that it is necessary to keep the food sterilized; that these bacteria are dangerous; that, in the case of putrefaction, there would be a gas formed in the can, which would cause a swelling, and press against the can; that the swelling would not be noticeable, until the pressure had reached such an extent that it overcame the resistance at the top and bottom of the can; that there might be gas in the can before there would be any external evidence of swelling.

There may be some other circumstances having a bearing, but the foregoing is a summary of the testimony.

Appellee says that, for the purpose of this appeal, in so far as the system itself is concerned, this court may find that defendant's system is as good as is customary, usual, and ordinary, in the method of performing such services, provided that the court or a jury is absolutely bound to believe the testimony of defendant's manager, even though un-

disputed, as to the details of the system which he described; and that, for a like purpose, the system and material used were the usual, general, and ordinary system used throughout the country in 1916, if the testimony of defendant's chemist, interested as he is, must be believed; and that there was no other more modern or sanitary method than that described. But it is argued that it may be inferred from the record that these beans were defective, either because of the failure on the part of defendant's employees to maintain all of the sanitary rules of the plant; or because the can was not hermetically sealed before sterilization; or because, subsequent to the sterilization, a small air hole may have existed in the top of the can, where the crimping machine failed to perform its function; or because, by reason of negligence in preparing the tomato sauce, the acid assailed the metal of the tin; or because the proper temperature was not maintained while the same was being sterilized; or because the different ingredients of the can of beans were not handled in co-ordination; or because, notwithstanding defendant's method of canning, the employees may not have always followed the method, and, therefore, there was opportunity for contamination of the contents before or after sterilization, and before the product left the plant. They argue, too, that the jury could properly have found from the evidence that plaintiff's illness was the result of ptomaine poisoning, and that the cause thereof was the eating of the beans. The contention is that, because of this and all the circumstances, plaintiff made a prima-facie case; and that, notwithstanding the defendant's evidence, there was a question for the jury as to whether plaintiff's prima-facie case had been negatived or overcome by defendant's evidence. They say, too, that if, under the evidence, defendant's liability is based upon a breach of warranty, express or implied, plaintiff would not be required to show negligence on the part of the defendant in the selection, preparation, and marketing of its product. Numerous cases are cited, holding that, in cases similar to this, the case should go to the jury on both questions of implied warranty

and negligence.   Appellant claims further that the label
on the can contained an express warranty, and that the im-
plied warranty was that the contents of the can were fit for
human consumption, and that they would not injure or kill
the consumer, and that the warranties were breached, to
plaintiff's damage.   Appellees admit and concede as follows:

"That there is a duty resting upon all manufacturers
and producers of food, to exercise a very high degree of care
in the selection, preparation, cooking, canning, packing, and
handling of their merchandise.   In fact, many cases go so
far as to hold that such manufacturers and canners are re-
quired to exercise the highest degree of care."

We think such ought to be and is the rule, that the high-
est degree of care must be exercised.

1.   Without restating the evidence, we are of opinion
that the jury could properly have found therefrom that the
eating of the beans by plaintiff was the proximate cause of
his illness.   As before stated, the medical
2.   FOOD:                      testimony is to that effect.   The circum-
    proximate
    cause of        stance that all those who ate the beans were
    sickness.
made sick, while those who did not partake,
were not ill, is to our minds significant.   There is doubtless
a possibility, or it could be surmised, that it was from the
drinking of the well water, or from eating canned peaches.
The circumstances in regard to these matters have been
before set out, and will not now be repeated.   As to this
feature of the case, we think there was a jury question.

2.   Counsel for appellee argues at considerable length
that there was no express warranty.   They argue, too, that
there can be no warranty, express or implied, because there
is no privity of contract between the defend-
3.   SALES:                      ant and the plaintiff.   They cite authorities,
    express  war-
    ranty:            some of which are by this court, to the fur-
    canned
    goods.          ther point, holding, as appellee claims, that
there cannot be both an express and im-
plied warranty, involving the same subject-matter, to wit,
quality or character of goods sold; that, when the express

warranty does not provide as to the same obligation, it excludes the implied. The Iowa cases cited on this point were not cases involving food products. One was the sale of a threshing machine; another, piling; and the other, the sale of sheep, and the warranty had to do with the breeding, health of the sheep, etc. For reasons appearing later, we do not determine this point. The cases cited by appellee, for the most part at least, hold that the action sounds in tort. We understand their argument to be that it is a tort action; but they contend that, under the record, there was no negligence shown, and that their evidence shows there was no negligence. Without citing the cases on the question as to express warranty, it seems to us that the language on the label does not constitute an express warranty that the food is wholesome and fit for use. The substance of it is that the can contains Van Camp's pork and beans, prepared with tomato sauce; that the meat has been inspected and passed at an establishment where Federal inspection is maintained; and that the contents are ready for the table. Directions are given how to serve hot, the quantity is given, and where it is prepared. From appellant's argument, we think they do not seriously contend that there is an express warranty. The part of the printing on the label relied upon, as an express warranty is, "The contents of this can are ready for the table, and can be served hot or cold." This, we think, means no more than that the beans may be used without cooking. Doubtless it should be construed to mean that it is for human consumption. But it is shown in other ways that it was so prepared, and that defendant knew it was to be sold for that purpose. We think we should spend no more time on this phase of the case.

3.   It must be admitted that there is much confusion in the authorities as to the theory of the liability of defendant, if any, in this class of cases. Some of the cases hold that the action is bottomed upon negligence alone; others, that there is an implied warranty; and still others, that there is an implied warranty, and that if, in addition, it is found that the seller was negligent in selling food products

that were dangerous to those who ate them, he would be liable for the consequences, if, by proper care, he could have known of the condition. There is a conflict in the decisions. We shall refer to appellee's cases first. It cites *Crigger v. Coca-Cola Bottling Co.*, 132 Tenn. 545 (179 S. W. 155, L. R. A. 1916B 877). This case is also cited by appellant. Appellee cites the case to sustain its contention that the liability, if any, is based upon negligence. Appellant cites the same case to the proposition that there is an implied warranty, regardless of any question of negligence, and, as we understand the argument, to also show that actions of this kind sound in tort. In that case, a bottle was sold by the defendant to a local dealer, and by him sold to plaintiff. In the bottle of coca cola was a decomposed mouse. The opinion states that the case is briefed by defendant on the question as to whether there is an implied warranty, regardless of any question of negligence; that the declaration, liberally treated, will admit the question; and that the case must be determined upon that standard. The opinion refers to the case of *Boyd v. Coca-Cola Bottling Wks.*, 132 Tenn. 23 (177 S. W. 80), as holding that want of contract, or privity, between the defendant and the person injured, constituted no defense, and that, for a negligent breach of the duty to exercise care, the defendant was liable. The court said further:

. "In the present case, we are to inquire a step further. Does this duty exist regardless of negligence, and is it in the nature of an implied warranty? Some of the cases seem to so hold. * * * From a careful consideration of the subject, and after mature thought, we are of opinion, as follows:

"1. That one who prepares and puts on the market, in bottles or sealed packages, foods, * * * owes a high duty to the public, in the care and preparation of such commodities, and that a liability will exist regardless of privity of contract to anyone injured for a failure to properly safeguard and perform that duty.

"2. This liability is based on an omission of duty or an

act of negligence, and the way should be left open for the innocent to escape.  *  *  *  Negligence is a necessary element in the right of action, and the better authorities have not gone so far as to dispense with actual negligence as a prerequisite to the liability. In fact, there is no logical basis of liability for personal injury, without some negligent act or omission."

That case was tried to a jury, and was submitted to the jury on the theory of negligence, and the jury found for the defendant. The case was affirmed, because there were sufficient inferences that might be drawn from the facts in the case to sustain the finding of the jury. The case is cited in a note to *Swank v. Battaglia*, L. R. A. 1917F 472, 474, as holding that there is no implied warranty. The note in the L. R. A. citation just given, at page 472, states that the late cases on the subject are to the effect that the sale of an article for food raises an implied warranty that the article is fit for food, and is not in an unmerchantable condition, or in a condition rendering it dangerous to be used for food (citing a number of cases). The *Crigger* case is also cited in *Friend v. Childs D. H. Co.*, 231 Mass. 65, 71 (120 N. E. 407). See, also, *Walters v. United Grocery Co.*, (Utah) 172 Pac. 473 (L. R. A. 1918E, 519). As we have said, as we understand appellee, its cases are cited to the proposition that there is no implied warranty, but that the case is bottomed upon negligence. The next case they cite is *Bishop v. Weber*, 139 Mass. 411 (1 N. E. 154), where the court said that liability does not rest so much upon an implied contract as upon a violation or neglect of a duty voluntarily assumed. In that case, the action was brought as an action of tort, and the court disregarded an amendment in regard to an implied warranty. In *Tomlinson v. Armour & Co.*, 75 N. J. L. 748 (70 Atl. 314, 316, 19 L. R. A. [N. S.] 923), the court assumed, without deciding, that there is no implied warranty, but that there was a duty resting upon the manufacturer to exercise care, etc.

*Nelson v. Armour Pkg. Co.*, 76 Ark. 352 (90 S. W. 288), is cited as holding that:

"In the sale of provisions by one dealer to another in the course of general commercial transactions, the maxim *caveat emptor* applies, and there is no implied warranty or representation of quality or fitness; but when articles of human food are sold to the consumer for immediate use, there is an implied warranty or representation that they are sound and fit for food. *Howard v. Emerson,* 110 Mass. 320; *Giroux v. Stedman,* 145 Mass. 439. \* \* \* Unlike covenants as to the title to land, a warranty upon the sale of personal property does not run with the property. There is no privity of contract between the vendor in one sale and the vendees of the same property in subsequent sales. Each vendee can resort, as a general rule, only to his immediate vendor. *Boyd v. Whitfield,* 19 Ark. 447; *Bordwell v. Collie,* 45 N. Y. 494. In this case, there was no privity of contract between the appellant and appellee, and no warranty passed with the property from appellee to appellant through his vendor."

Appellee also cites, as sustaining its claims, Benjamin on Sales (7th Ed.) 661; 2 Mechem on Sales, Section 1356; Tiedeman on Sales, Section 191; *Flessher v. Carstens Packing Co.,* 93 Wash. 48 (160 Pac. 14); *Winsor v. Lombard,* 18 Pick. (Mass.) 57; *Meshbesher v. Channellene Oil Co.,* 107 Minn. 104 (119 N. W. 428). Appellant also says that the action sounds in tort, and cites the following cases to support the claim: *Crigger v. Coca-Cola Bottling Co.,* 132 Tenn. 545 (L. R. A. 1916B, 877); *Tomlinson v. Armour & Co.,* 75 N. J. L. 748 (19 L. R. A. [N. S.] 923); *Thomas v. Winchester,* 6 N. Y. 397 (57 Am. Dec. 455); *Bark v. Dixson,* 115 Minn. 172 (3 N. C. C. A. 106); *Pantaze v. West,* 7 Ala. App. 599 (61 So. 42, 44); *Doyle v. Fuerst & Kraemer,* 129 La. 838 (40 L. R. A. [N. S.] 480); *Boyd v. Coca-Cola Bottling Wks.,* 132 Tenn. 23 (177 S. W. 80, 81); *Parks v. Yost Pie Co.,* 93 Kan. 334 (L. R. A. 1915C, 179). Plaintiff also claims that it is based upon a breach of warranty, citing the following cases: *Craft v. Parker, Webb & Co.,* 96 Mich. 245 (21 L. R. A. 139); *Truschel v. Dean,* 77 Ark. 546

(92 S. W. 781) ; *Bunch v. Weil,* 72 Ark. 343 (65 L. R. A. 80) ; *Farrell v. Manhattan M. Co.,* 198 Mass. 271 (15 Ann. Cas. 1076) ; *Van Bracklin v. Fonda,* 12 Johns. (N. Y.) 468 (7 Am. Dec. 339) ; *Wiedeman v. Keller,* 171 Ill. 93 (49 N. E. 210) ; *Jackson C. B. Co. v. Chapman,* 106 Miss. 864 (64 So. 791) ; *Nelson v. Armour Pkg. Co.,* 76 Ark. 352; *Catani v. Swift & Co.,* 251 Pa. 52 (95 Atl. 931) ; *Parks v. Yost Pie Co.,* 93 Kan. 334 (144 Pac. 202, L. R. A. 1915C, 179) ; *Tomlinson v. Armour & Co.,* 75 N. J. L. 748 (70 Atl. 314, 19 L. R. A. [N. S.] 923, 935) ; *Ward v. Morehead C. S. F. Co.,* 171 N. C. 33 (87 S. E. 958). He also contends that, by his evidence, he made a prima-facie case, and that he was entitled to go to the jury on either or both theories of implied war- ranty and negligence; that it was for the jury to say whether the evidence introduced by defendant had met the prima-facie case made. On this proposition, they cite *Crigger v. Coca-Cola Bottling Co.,* 132 Tenn. 545 (L. R. A. 1916B, 877) ; *Jackson C. B. Co. v. Chapman,* 106 Miss. 864 (64 So. 791) ; *Pantaze v. West,* 7 Ala. App. 599 (61 So. 42) ; *Doyle v. Fuerst & Kraemer,* 129 La. 838 (40 L. R. A. [N. S.] 480) ; *Roberts v. Anheuser .Busch,* 211 Mass. 449 (98 N. E. 95, 96) ; *Rosenbusch v. Ambrosia Milk Corpn.,* 181 App. Div. 97 (168 N. Y. Supp. 505) ; *Catani v. Swift & Co.,* 251 Pa. 52 (L. R. A. 1917B, 1272) ; *Craft v. Parker, Webb & Co.,* 96 Mich. 245 (21 L. R. A. 139) ; *Bark v. Dixson,* 115 Minn. 172 (3 N. C. C. A. 106) ; *Freeman v. Schultz Bread Co.,* 100 Misc. Rep. 528 (163 N. Y. Supp. 396) ; *Greenfield v. Chicago & N. W. R. Co.,* 83 Iowa 270; *Weber v. Chicago, R. I. & P. R. Co.,* 175 Iowa 358; *Hemmi v. Chicago G. W. R. Co.,* 102 Iowa 25; *Thompson v. Keokuk & W. R. Co.,* 116 Iowa 215; *Larkin v. Chicago & G. W. R. Co.,* 118 Iowa 652, 657 ; *Iowa Cent. R. Co. v. Hampton E. L. & P. Co.,* 204 Fed. 961.

We shall not attempt to review all of plaintiff's cases. Some of them will be noticed. In *Craft v. Parker, Webb & Co.,* 96 Mich. 245 (21 L. R. A. 139), the plaintiff brought an action for negligence in selling a piece of rolled bacon. The court stated:

"A dealer who sells food for consumption impliedly war-
rants that it is fit for the purpose for which it is sold. If,
in addition to this implied warranty, it is found that he
was negligent in selling meat that was dangerous to those
who ate it, he will be liable for the consequences of his act,
if he knew it to be dangerous, or, by proper care on his part,
could have known its condition."

In that case, it was held that the case presented was for
the jury.

In *Truschel v. Dean*, 77 Ark. 546 (92 S. W. 781), it is
held:

[In sales of goods] "where the purchaser has had no
opportunity to inspect them, there is an implied warranty
that they are reasonably fit for the purposes for which they
are ordinarily used; and when they are, under such circum-
stances, purchased for a particular purpose known to the
seller, there is an implied warranty that they are fit for that
purpose."

In *Wiedeman v. Keller*, 171 Ill. 93 (49 N. E. 210), it is
said:

"Where, however, articles of food are purchased from a
retail dealer for immediate consumption, the consequences
resulting from the purchase of an unsound article may be
so serious and may prove so disastrous to the health and
life of the consumer that public safety demands that there
should be an implied warranty on the part of the vendor
that the article sold is sound and fit for the use for which it
was purchased. It may be said that the rule is a harsh
one; but, as a general rule, in the sale of provisions the
vendor has so many more facilities for ascertaining the
soundness or unsoundness of the article offered for sale
than are possessed by the purchaser, that it is much safer
to hold the vendor liable than it would be to compel the
purchaser to assume the risk."

In that case, however, the vendor was a retail dealer,
and, as such, sold the meat to plaintiff. The words "for im-
mediate consumption" have less significance where the sale

is by the manufacturer, rather than by the dealer to the consumer.

In *Jackson C. B. Co. v. Chapman,* 106 Miss. 864 (64 So. 791), another mouse case, where a mouse was found in a bottle of coca cola, the court said:

"'When a manufacturer makes, bottles, and sells to the retail trade, to be again sold to the general public, a beverage represented to be refreshing and harmless, he is under a legal duty to see to it that, in the process of bottling, no foreign substance shall be mixed with the beverage, which, if taken into the human stomach, will be injurious.'"

In *Nelson v. Armour Pkg. Co.,* supra, it was held that, in the sale of provisions by one dealer to another, in the course of general business transactions, the maxim *caveat emptor* applies; but, when articles of human food are sold to the customer for immediate use, there is an implied warranty or representation that they are sound and fit for food.

In *Catani v. Swift & Co.,* 251 Pa. 52 (95 Atl. 931, L. R. A. 1917B, 1272), the *Wiedeman* case is quoted with approval, the action being based upon disease arising from the eating of diseased pork. The court further says:

"'In this case, however, the appellee was a regular retail dealer, and as such he sold the meat to the appellant for domestic use, and under the law, as it seems to be settled in this country, as the meat turned out to be unwholesome, he is liable, although he was not aware that it was diseased when he sold it to appellant.' * * * 'The remedies of injured consumers ought not to be made to depend upon the intricacies of the law of sales. The obligation of the manufacturer should not be based alone upon privity of contract. It should rest, as was once said, upon "the demands of social justice." The producer should be held responsible for the results of negligent acts which he can readily foresee. * * * The meat packer who fails to inspect his products for poisonous parasites or ingredients, knows that poison will poison, and that the persons to be poisoned through his neglect will be those who eat his products, and no one else.

The natural, probable, and almost invariable result of his negligence will be injury to the consumer, and, in my opinion, every consideration of law and public policy requires that the consumer should have a remedy.' * * * Under the foregoing principles, governing the sale of articles of food, a prima-facie case is made out by proof that the meat sold by defendant was diseased, and caused the death of plaintiff's husband. It was not necessary to go farther, and prove defendant knew the food was unwholesome. * * * It was bound to know that the meat was unwholesome and unfit for food, and this duty was not performed by merely showing an inspection and approval by the United States government inspectors."

Other cases go as far as this last one. *Farrell v. Manhattan M. Co.,* 198 Mass. 271 (15 Ann. Cas. 1076); *Van Bracklin v. Fonda,* 12 Johns. (N. Y.) 468 (7 Am. Dec. 339).

In the case of *Parks v. Yost Pie Co.,* 93 Kan. 334 (144 Pac. 202, L. R. A. 1915C, 179, 181), the plaintiff came to his death from ptomaine poisoning, resulting from eating a pie manufactured by the defendant pie company, sold to a retail grocer, who, in turn, sold it to the plaintiff. The court says:

"A manufacturer or dealer who puts human food upon the market for sale or for immediate consumption does so upon an implied representation that it is wholesome for human consumption. Practically, he must know it is fit or take the consequences if it proves destructive."

In *Ward v. Morehead C. S. F. Co.,* 171 N. C. 33 (87 S. E. 958), the court says:

"The authorities are numerous that there is an implied warranty that runs with the sale of food for human consumption, that it is fit for food and not dangerous and deleterious,"—citing *Watson v. Augusta Brewing Co.,* 124 Ga. 121 (52 S. E. 152, 1 L. R. A. [N. S.] 1178).

The following case holds that there can be no action based upon breach of warranty, because there is no privity of contract between the original manufacturer and the consumer who purchases from the retailer. *Freeman v. Schultz*

*Bread Co.,* 100 Misc. Rep. 528 (163 N. Y. Supp. 396.)

In *Bark v. Dixson,* 115 Minn. 172 (3 N. C. C. A. 106), the complaint was drawn both to fit the theory of implied warranty and the theory of negligence. The answer was a general denial. The court said:

"It does not seem important whether the action was based on negligence or on a contract and breach of an implied warranty. The evidence was sufficient to justify the verdict on either theory."

That was a case where defendant furnished plaintiff, their employee, tainted meat, as food.

In *Boyd v. Coca-Cola Bottling Wks.,* 132 Tenn. 23 (177 S. W. 80), the court said:

"When the manufacturer of this beverage undertook to place it on the market in sealed bottles, intending it to be purchased and taken into the human stomach, under such circumstances that neither the dealer nor the consumer had opportunity for knowledge of its contents, he likewise assumed the duty of exercising care to see there was nothing unwholesome or injurious contained in said bottles. For a negligent breach of this duty, the manufacturer became liable to the person damaged thereby. * * * Some of the cases place the liability on the grounds heretofore stated. Others place it on pure food statutes. Others say there is an implied warranty when goods are dispensed in original packages, which is available to all damaged by their use, and another case says that the liability rests upon the demands of social justice. * * * Upon whatever ground the liability of such a manufacturer to the ultimate consumer is placed, the result is eminently satisfactory, conducive to the public welfare, and one which we approve."

In *Parks v. Yost Pie Co.,* 93 Kan. 334 (L. R. A. 1915C, 179), on 180, it is said:

"The degree of care required of a manufacturer or dealer in human food for immediate consumption is much greater by reason of the fearful consequences which may result from what would be slight negligence in manufactur-

ing or selling food for animals. In the latter a higher degree of care should be required than in manufacturing or selling ordinary articles of commerce. A manufacturer or dealer who puts human food upon the market for sale or for immediate consumption does so upon the implied representation that it is wholesome for human consumption. Practically, he must know it is fit, or take the consequences if it proves destructive."

From the decisions, and particularly the later decisions, we think there is an implied warranty, as contended by plaintiff, and that the question as to privity is not controlling. The case should have gone to the jury on that question. We are of opinion, too, that, on the whole case, there was sufficient evidence to take the case to the jury on the question of negligence, and that it was for the jury to say whether plaintiff's prima-facie case had been negatived or overcome by the testimony introduced on behalf of the defendant. The court erred in requiring plaintiff to elect, as between implied warranty and negligence. While it is true that no particular act of negligence is shown by plaintiff, in the very nature of the case that could not be done. It is also true that, according to the defendant's evidence, its plant and method of manufacture are good,—probably as good as any; still, it does appear that the method was not always adhered to by defendant's employees. We think that, from all the circumstances shown by the evidence, the jury could properly have inferred and found that the can of beans in question, and perhaps a batch, as one of defendant's witnesses calls it, were defective. Take the two coca cola cases before cited, where a decomposed mouse was found in a sealed bottle of the fluid, the defendant's evidence tended to show care on the part of the company in bottling the product. In one of the cases, it was shown that the bottle was inspected under an electric light; that they were finally inspected after being capped or corked; that the bottles were thoroughly cleansed; that the fluid was strained into

4. NEGLIGENCE: evidence: sufficiency.

the bottle through a fine strainer, and so on.   If all these precautions had been taken at the particular time when bottles in question were filled and corked, it would seem improbable, if, indeed, not impossible, that a mouse could get into the bottle.   On the other hand, it would, of course, be impossible for a mouse to get into the bottle after it was corked up, and after it left the factory; and yet, the mouse was in the bottle.   Could the court say, as a matter of law, that the mouse did not get into the bottle during the process of manufacture?   We think not.   The jury, under all the circumstances, would have been justified in inferring and finding that some of the things usually done in the bottler's method to prevent foreign substances from getting into the bottle, were not done.   In other words, the circumstances were such that it would be for the jury to determine which was the more reasonable probability.   That case was submitted to the jury, and the court said, in the *Crigger* case:

"In the present case, the mouse might have gotten into the bottle by some unavoidable accident, but proper inspection should have disclosed the fact, and if in the light of the finding by the jury it were fairly inferable that the mouse was bottled up at the Bottling Company plant, we would consider it our duty to reverse the case, because of the high duty resting on the defendant.   *   *   *   In view of the extraordinary care shown to exist at the bottling plant, and the verdict of the jury, it may be that this thing occurred without the fault of the defendant.   There are sufficient inferences that may be drawn from the facts to sustain the finding."

In the instant case, there was nothing in the appearance of the can to put plaintiff or his mother upon inquiry.   The can seemed to be all right.   It had been, in fact, freshly manufactured; no swelling of the ends appeared; the label on the can was not old or soiled,—at least, there is no evidence that it was; and the evidence shows that it appeared to be all right.

4.   It is next contended by appellant that, if the liabil-

ity of defendant is based upon tort, plaintiff may rely upon the prima-facie case of negligence arising from the sickness caused by eating the beans, where it is shown, as it was in the instant case, that all of the instrumentalities and materials used by the defendant in the preparation of its pork and beans were wholly within the control and under the management of the defendant—wholly beyond the knowledge of plaintiff; that the injury sustained was unusual, and not such an injury as ordinarily occurs, where proper care has been exercised by the defendant in the selection of materials, and in the preparation and marketing thereof. We are not cited to any Iowa cases holding that this doctrine applies in this kind of case, and we do not find that the exact proposition has ever been determined by this court. There are cases, however, holding that the doctrine does not apply. In the instant case, the facts were all in defendant's possession, as much as they are in a fire case, so that the same reason for the rule exists in this case as in such case. It is true that, in fire cases, the prima-facie case is provided by statute. In the case at bar, we have already seen, and appellee concedes, that a high degree of care is imposed upon defendant in the preparation of food products for human consumption. We hold that, under the record in this case, plaintiff made a prima-facie case, and that it was for the jury to say whether such prima-facie case was met or overcome by the evidence introduced on behalf of the defendant.

5. FOOD: negligence in manufacturing: prima-facie case.

In *Freeman v. Schultz Bread Co.*, 100 Misc. Rep. 528 (163 N. Y. Supp. 396), the plaintiff, thirteen years of age, while starting to eat a piece of bread which he had bitten from a slice cut from a whole loaf, bit into a nail which was in the loaf, below the surface, and as a result, lost two teeth. The loaf was made by the defendant and sold to the grocer, from whom it was purchased by the plaintiff's sister. It was established that there were no nails in the plaintiff's home or in the grocer's store, with which the loaf could have come in contact. The defendant offered

no evidence, but rested at the close of the plaintiff's case, claiming that the plaintiff was bound to trace the manufacture of the loaf, and show that the nail was put in or permitted to be put in the loaf, through some neglect of the defendant in the process of manufacture.

The court in this case found that the doctrine of prima-facie case applied, and that there was sufficient evidence to take the case to the jury, and that the verdict for the plaintiff was justified. In the *Crigger* case, supra, the doctrine was not referred to as such, but the facts were similar, and it was held to be a jury question.

In *Rosenbusch v. Ambrosia Milk Corpn.*, 181 App. Div. 97 (168 N. Y. Supp. 505), the court said:

"The plaintiff rested on proof that she was poisoned by the 'mammala' thus prepared and placed on the market by the defendant. She offered no other evidence tending to show negligence on the part of the defendant, excepting the representations made by it on the labels and in circulars. There is, therefore, no express evidence that the 'mammala' was in the same condition when administered to the plaintiff as when it was placed in the can by the defendant. This presents a novel, interesting question of law as to whether the evidence was sufficient to make out a prima-facie case of negligence on the part of the defendant."

In *Catani v. Swift & Co.*, 251 Pa. 52 (L. R. A. 1917B, 1272, 1276), the court held that, in the sale of articles of food, a prima-facie case is made out by proof that the meat sold by defendant was diseased, and caused the death of plaintiff's husband.

In *Jackson C. B. Co. v. Chapman*, supra, plaintiff showed that he was made ill by drinking coca cola from a bottle in which was contained a decomposed mouse. Defendant's evidence was that its system was complete. Held, a jury question. As to the fire cases under the statute, appellant cites *Greenfield v. Chicago & N. W. R. Co.*, 83 Iowa 270.

In *Dail v. Taylor*, 151 N. C. 284 (28 L. R. A. [N. S.] 949), it was held that the mere explosion of one bottle of

coca cola., resulting in personal injury, did not entitle plaintiff to go to the jury on the question of negligence; but it was held that proof of like explosions at about the same time was sufficient to take the case to the jury. The court held that negligence could be proved circumstantially, and that, if the facts proved establish the more reasonable probability of defendant's negligence, the case could not be withdrawn from the jury, though there might be a possibility of accident, arising under the evidence. In the note to that case, it is said that the fact that negligence on the part of a seller or manufacturer is not made out from the mere fact that personal injury resulted from the use of the article sold or manufactured, was, with little or no discussion, declared to be the law in certain cases (citing them).

· Appellee cites *Hollingsworth v. Midwest Serum Co.,* 183 Iowa 280. The question in that case was whether defendant, having violated a. statute, was necessarily negligent. The statute did not make the producer a warrantor of results. Human life was not at stake, so that, under such circumstances, the question of implied warranty would probably not apply at all. A higher degree of care would be required where food is sold for human consumption. We· make a distinction between food products which are canned, bottled, or wrapped in such a way that the contents and the condition thereof may not be known to the purchaser until opened for use by the consumer, and products which are not so put up, and the condition of which is observable. · Even in the latter case, cases might arise where the seller would be liable. *Walters v. United Grocery Co.,* supra.

We are of opinion that the duty of a manufacturer to see to it that food products put out by him are wholesome, and the implied warranty that such products are fit for. use, run with the sale, and to the public, for the benefit of the consumer, rather than to the wholesaler or retailer, and that the question of privity of contract in sales is not controlling, and does not apply in such a case.

If we call it a duty to use care in the preparation and manufacture, then, in that sense, a breach of that duty would constitute negligence. Or it may be treated as a representation or a warranty that, because of the sacredness of human life, food products so put out are wholesome. In either event, a failure in this respect is a breach of duty and a breach of warranty, and the plaintiff suing may rely on either or both, and, when he makes a prima-facie case, he is entitled to go to the jury on the question as to whether defendant's evidence negatives plaintiff's prima-facie case. As said in the *Boyd* case, supra:

"Upon whatever ground the liability of such a manufacturer to the ultimate consumer is placed, the result is eminently satisfactory, conducive to the public welfare, and one which we approve."

For an interesting discussion of this subject, and the citation of many cases, see Iowa Law Bulletin, Vol. 5, page 86. See, also, *Friend v. Childs D. H. Co.*, 5 A. L. R. 1100; *Ward v. Great Atl. & Pac. T. Co.*, 5 A. L. R. 242, and notes; Yale Law Journal 782.

5. Appellant contends that the court erred in excluding evidence of other defective cans of beans. If the evidence is connected up so as to show that the offered

6. EVIDENCE: similar facts: impure food.

evidence had reference to purchases out of the same consignment, or batch, we see no reason why the evidence is not admissible. It is not necessarily evidence of other acts of negligence. We think it has a bearing on the question of negligence. That is the theory of the *Dail* case, supra. The evidence shows that defendant was producing 35,000,000 cans a year, or several thousand an hour; that, at least on one occasion, an entire batch was found defective. Though it appears that defendant's method or system is good, yet human agencies, which are not always absolutely dependable, were relied upon to carry out the system. See, also, on the question as to evidence of other defective cans, *Ward v. Morehead C. S. F. Co.*, supra; *Craft v. Parker, Webb & Co.*, supra; *Kennedy v. Plank*, 120 Wis. 197 (97 N. W. 895);

*State v. Good,* 56 W. Va. 215 (49 S. E. 121).

6. The question of *caveat emptor* has been referred to in some of the cases heretofore cited. In the earlier cases, followed, perhaps, by some of the later ones, when a person went to market, with a market basket on his arm, and could examine the food, the doctrine was held to apply, in the absence of a warranty. But the business of canning food products of almost every kind has increased enormously in recent years. The purchaser has no opportunity of examination, until the can is opened for use; and, under the circumstances of this case, we think the doctrine does not apply. It is possible that, when Mrs. Davis purchased this can, had it had the appearance of being old, and the label soiled, or the ends swollen, or something of that kind, the doctrine might apply.

For the reasons given, the judgment is reversed and remanded for a new trial.—*Reversed and remanded.*

WEAVER, C. J., LADD, EVANS, GAYNOR, and STEVENS, JJ., concur.

SALINGER, J. (dissenting). In my view, the only question to be decided is whether defendant has used the highest degree of care. I think it has shown conclusively that it used such care.