Earl Bowman, Administrator of the Estate of Howard Eugene Bowman, Deceased, Appellee, v. Woodway Stores, Inc., Appellant.

308

October term, 1929.   Heard in this court at the Opinion filed February 28, 1930.

E. M. SPILLER and W. H. HART, for appellant.

D. L. DUTY, RAY D. HENSON and GEO. T. CARTER, for appellee.

MR. JUSTICE NEWHALL delivered the opinion of the court.

Appellee instituted suit against appellant to recover damages for the death of appellee's intestate claimed to be caused by drinking impure condensed milk purchased by the father of the deceased from appellant at its store in Johnson City, Illinois.

From the evidence offered on behalf of appellee it appears that on June 18, 1927, Earl Bowman, father of the deceased, purchased a dozen cans of condensed milk from appellant at its place of business; that appellant was engaged in conducting a retail store where foodstuffs were kept for sale; that at the time of the purchase the father made known his wants at the store and there was delivered to him a dozen cans of condensed milk, in one package, for which he paid 60 cents; that appellee had been in the habit for a considerable period of time of purchasing similar cans of milk which were labeled and sold under a trade brand called "Pet Milk"; that on the two consecutive days following the purchase a can of milk was opened and used by the family of appellee, and no ill effects were suffered by the family from such use; that on June 22 a third can of milk was opened by punching two holes in the top of the can, the milk therefrom was placed in a pitcher to which was added water, and was served at the breakfast table by mixing the same with grapenuts. The family consisted of appellee and his wife, and their child Howard Bowman, who was about 18 months old.

About two hours after Howard Bowman partook of the milk and grapenuts the child was taken sick and died the next day. The father and mother drank of the milk, taken from the same can, at the breakfast meal and they were also stricken with what was diagnosed as ptomaine poisoning by the family physician. All three were sick at the same time, had prostrations, were cold with clammy sweats and were purging, but the symptoms of the boy were much worse. The doctor who was called to treat the family made a physical examination of the remaining grapenuts and milk on the morning he was called to treat these persons, and stated, in his opinion, that the ptomaine poisoning was caused by the drinking of the milk; that

the death of the child was due to such poisoning. The milk prior to its use by the family of appellee appeared to be in good condition, there being no bad taste or smell which could be detected from casual examination.

The evidence for appellant shows that condensed milk, similar to that in question, had been manufactured for many years at Greenville, Illinois, under the trade brand of "Pet Milk"; that the company in the preparation of the milk exercised care to sterilize the cans, the best known methods of preparation were used by the company to prevent deterioration of the milk after being placed in sealed tin containers and careful inspection was made in the manufacture to determine any defective cans or any imperfections in the preparation of the milk.

At the close of appellee's evidence and again at the close of all the evidence, appellant moved the court for a directed verdict, which motions were denied and the trial resulted in a verdict in favor of appellee for $6,772, upon which judgment was entered.

Appellant's first contention is that the declaration is insufficient to support the judgment; first, because it fails to charge in apt words that the "milk" was poisonous; second, failure to charge that the deceased exercised due care, or was of such immature age as would excuse such want of care; third, failure to charge that the parents of the deceased exercised due care; fourth, want of averment, either of negligence, or express warranty of the fitness of the milk for human consumption.

On demurrer a declaration is construed against the pleader, but after verdict all intendments and presumptions are in its favor. If a declaration contains terms sufficiently general to include, by fair and reasonable intendment, any matter necessary to be proved, and without proof of which the jury could not

have given the verdict, the want of an express aver-
ment of such matter is cured by the verdict. *Sargent
Co. v. Baublis,* 215 Ill. 428.

The declaration is not based upon negligence on the
part of appellant, but is grounded upon the theory
that appellant was engaged in the business of retailing
groceries to the general public for their immediate use
and consumption as food, the legal relationship be-
tween the deceased, his father and appellant; that
from this relationship the implied warranty that the
law supplies, the breach of that warranty and the
damages resulting to the next of kin of the deceased
from the breach. The declaration charged that the
milk sold by appellant caused the death of appellee's
intestate, and while the trial court may have required,
on demurrer, more explicit allegations as to the pre-
cise details of the alleged facts which caused the in-
jury, nevertheless after verdict, in view of the prin-
ciples of law enunciated at length in the *Baublis* case,
*supra,* and in *Greenwood v. Thompson Co.,* 213 Ill.
App. 371, we are of the opinion that the declaration
is sufficient to support the judgment.

Prior to the passage of the Uniform Sales Act,
Cahill's St. ch. 121a, ¶ 4 *et seq.,* in 1915, it was held
by the Supreme Court in *Wiedeman v. Keller,* 171
Ill. 93, that the decided weight of authority in the
United States was that in all sales of meats and pro-
visions for immediate domestic use by a retail dealer,
there was an implied warranty of fitness and whole-
someness for consumption. The *Wiedeman* case in-
volved the sale of meat that was open to inspection,
while the sale in the instant case was in a sealed tin
container. In the *Wiedeman* case it was said,

"In an ordinary sale of goods the rule of *caveat
emptor* applies, unless the purchaser exacts of the
vendor a warranty. Where, however, articles of food
are purchased from a retail dealer for immediate con-

sumption, the consequences resulting from the purchase of an unsound article may be so serious and may prove so disastrous to the health and life of the consumer that public safety demands that there should be an implied warranty on the part of the vendor that the article sold is sound and fit for the use for which it was purchased. It may be said that the rule is a harsh one; but, as a general rule, in the sale of provisions the vendor has so many more facilities for ascertaining the soundness or unsoundness of the article offered for sale than are possessed by the purchaser, that it is much safer to hold the vendor liable than it would be to compel the purchaser to assume the risk. Moreover, we have a statute which makes it a crime for any person to sell or offer to sell, or keep for sale, flesh of any diseased animal. (Hurd's Stat. 507.)''

In *Chapman v. Roggenkamp,* 182 Ill. App. 117, the Appellate Court for the First District considered the question of liability where a person was poisoned by eating unwholesome canned peas purchased of a retail dealer, and held that there was a responsibility predicated on an implied warranty that the peas were fit for food.

In *Sloan v. Woolworth* Co., 193 Ill. App. 620, the Appellate Court for the Third District reached the same conclusion as to the liability of a retail dealer for damages in the sale of canned goods, and held under the doctrine announced in the *Weideman* case, *supra,* there was no distinction as to liability based upon the fact that the goods sold for consumption were in sealed packages or tin containers.

The Uniform Sales Act, Cahill's St. ch. 121a, ¶ 4 *et seq.,* was adopted subsequently to the decisions in the foregoing cases, and it is contended by appellant that Clause 4 of section 15 precludes any implied warranty by reason of the sale of the milk in question under the trade name of ''Pet Milk'' in sealed tin containers.

Section 15 of the Uniform Sales Act, Cahill's St. ch. 121a, ¶ 18, is as follows:—

"Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.

"(2) Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality.

"(3) If the buyer has examined the goods, there is no implied warranty as regards defects which such examination ought to have revealed.

"(4) In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose.

"(5) An implied warranty or condition as to quality or fitness for a particular purpose may be annexed by the usages of trade.

"(6) An express warranty or condition does not negative a warranty or condition implied under this act unless inconsistent therewith."

In *Ward v. Great Atlantic & Pacific Tea Co.*, 231 Mass. 90, 5 A. L. R. 242, the court considered at length, under the provisions of the Uniform Sales Act, the liability of a retail grocery dealer for damages resulting from the sale of beans in sealed tin containers, sold under a trade name, and held the dealer liable on the

theory of a breach of implied warranty. In passing on the nature of the transaction the Massachusetts court held,

"The transaction between the plaintiff and the defendant as to the can of beans necessarily involved a purchase of food to be eaten. That need not be stated in precise words. It was an underlying and essential condition of the contract, implied without expression. It arose from the nature of the goods, the size of the purchase, and the terms of the label. It is provided by the Sales Act (Stat. 1908, ch. 237), § 15 (1): 'Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose.'

"That provision governs the relations of the parties in the case at bar. In this respect, the statute is in substance, so far as concerns a dealer such as the defendant, simply a codification of the common law."

The court in the opinion in the *Ward* case quoted from decisions of the English courts under the English Sale of Goods Act, which does not differ in any material respect from the particular provision in question of the Illinois Uniform Sales Act, and commenting on these decisions the court said, "It is manifest, therefore, that the English courts hold that under the Sale of Goods Act there is no distinction between canned goods and goods not canned and open to inspection, so far as concerns the implied warranty of fitness in sales of food to the ultimate consumer. Decisions of this character, in view of the fact that the English Sale of Goods Act was enacted before our own, and of the close similarity of the pertinent section of each act, are entitled to consideration." To the same effect are the

cases of *Davis v. Van Camp Packing Co.*, 189 Iowa 775, 176 N. W. 382 (17 A. L. R. 649), and *Hertzler v. Manshum*, 228 Mich. 416, 200 N. W. 155.

The *Wiedeman* case, *supra,* predicated a liability upon the sale of foods for immediate consumption, upon the ground that the consequences resulting from the purchase of an unsound article may be so serious to the life and health of the consumer that public safety demanded there should be an implied warranty, on the part of the vendor, that the article sold is sound and fit for the use for which it was purchased. Since the *Wiedeman* case was decided the Pure Food Statute was passed in 1907 (Cahill's St. ch. 56b). This statute fixes penalties for the sale of impure food and is a police regulation in the interest of the public health and does not make knowledge by the retailer a necessary element of the offense. *Sloan v. Woolworth Co., supra.*

A dealer in foodstuffs who sells injurious foods is not protected under the Pure Food Statute by the fact that the goods were manufactured by another and sold in the original package under a trade name. *People v. Price,* 257 Ill. 587.

We are in accord with the reasoning and holding of the Massachusetts court in the *Ward* case, *supra,* to the effect that clause 1 of section 15 of the Uniform Sales Act governs the relationship of the parties in the case at bar and that appellant is not relieved from its implied warranty by the mere fact that the milk in question was sold in tin containers under a trade name or brand; that clause 4 of said section 15 of the Uniform Sales Act does not apply to the sale of foodstuffs by a retail dealer for immediate consumption, for, if this were so, the effect would be to relieve from liability a retailer who sold articles of food under a patent, trade name or brand, and thereby render nugatory the provisions of the pure food statute enacted

for the purpose of protecting the life and health of the persons who purchase food supplies for immediate consumption.

·Appellant further contends that the evidence discloses that appellee failed to establish that the milk in question was the cause of the death of the deceased, and that the only scientific way by which it could be determined whether or not the milk was poisonous would be to have a chemical examination of the milk and all food and drink which the deceased had partaken of for a period of three days prior to his sickness.

Doctor Green, the family physician, testified that he treated the deceased and other members of the family for what he diagnosed as ptomaine poisoning, and after an examination of the various articles of food which had been partaken of at the morning meal and from the history of the case, stated that, in his judgment, the death of deceased was caused by ptomaine poisoning originating from the milk.

The record shows that the father purchased a dozen can package of milk on Saturday, June 18, 1927; that on the Wednesday following, the can of milk in question was opened and poured into a pitcher with water added. When the can was opened, by punching holes in the cover, it was apparently in good condition on the outside, but subsequent examination showed a black spot or blemish on the inside of the can. The milk had been prepared and placed in tin containers in April, 1927. The proof on the part of appellee tends to show that the usual and customary methods of cleanliness were used by the family in the preparation of the meal at which the milk was consumed as had been used by the family in the past. That at prior meals milk from the last purchase made by appellee had been used with grapenuts from the same package without any ill effects.

Medical experts testified on behalf of appellant that from the examination and history of the case which had been detailed by appellee's medical witness, that it would be impossible to exactly determine what was the cause of the death of the decedent.

The question of the cause of death and whether the same was due to drinking impure milk was a question of fact for the jury to determine under all the facts and circumstances in evidence and after examination of the record we are unable to say that the verdict in this respect is manifestly against the weight of the evidence.

It is argued that the trial court erred in the admission of incompetent evidence, in that Doctor Green was permitted to answer where, in his judgment, the ptomaine poisoning originated, from which resulted the sickness and death of the deceased. On the trial the objection then made to the opinion evidence of the doctor was that the witness was not qualified to give an opinion, not having made a chemical analysis of the food and drink partaken of by the deceased. The objection now made is that the doctor, by his answers to the questions, was by the court's ruling permitted to usurp the function of the jury and to determine the ultimate question of fact, as to the cause of death, which it was the sole province of the jury to determine. Although the question now raised as to the competency of this evidence was not urged in the trial court, and, therefore, not subject to review, considering the form of the question, it is apparent that the doctor was only asked to express an opinion based upon his judgment. Accordingly, the jury were not precluded from considering his opinion and giving it such weight as in their judgment it was entitled to, thereby leaving the ultimate question of the cause of the death for the jury to decide after considering all of the evidence. We have considered this, and the

other objections urged by appellant to the questions asked of appellee, and are of the opinion that the court did not err in its rulings on the admission of the evidence objected to by appellant.

Counsel urge that the court erred in giving appellee's instructions which are in accordance with the principles of law applicable to the facts in the case, and we are of the opinion that the giving of these instructions on behalf of appellee were proper. It is further urged that there is a conflict between appellee's fifth given instruction and appellant's eighth given instruction, but we are of the opinion that appellant, having requested the giving of this instruction, is not in a position to urge this objection, even though it be said there was a conflict.

It is finally contended that the verdict is excessive, but in view of the age of the decedent it was, under all the circumstances, peculiarly within the province of the jury to fix the amount of damages and we cannot say that the same was so excessive as to require a new trial, in view of the present purchasing power of money as compared with that of several years ago. *Northern Trust Co. v. Grand Trunk Western R. Co.,* 207 Ill. App. 11.

For the reasons aforesaid the judgment of the circuit court is affirmed.

*Affirmed.*